## UNITED STATES v. HAMILTON.

### Cr. No. 212.

United States District Court,
S. D. West Virginia.

March 15, 1951.

---

A. Garnett Thompson, U. S. Atty., Charleston, W. Va., for the Government.

Mohler, Peters & Snyder, James M. Ballengee, Charleston, W. Va., for defendant.

BEN MOORE, Chief Judge.

Wayman C. Hamilton was found guilty after a jury trial on an indictment charging him in several counts with violations of the mail fraud statute. He has filed a motion to vacate the judgment and sentence as provided in 28 U.S.C.A. § 2255, alleging that he was deprived of constitutional rights by reason of certain circumstances connected with the trial, together with other grounds.

The motion is lengthy. It was prepared by Hamilton himself. After he filed it, his present counsel was appointed for him by the Court, he having filed the requisite affidavit entitling him to proceed in forma pauperis, and having requested the appointment of a different lawyer. Compliance with his request that he be represented by a different attorney was made necessary by the fact that his motion was based in part on allegations that he was not properly represented at the trial. I find no merit in this contention, and the only grounds of the motion which I regard as worthy of consideration are those referring to particular happenings in the trial and appearing from the following account thereof:

The scheme which was attributed to Hamilton was that he had falsely used the names of numerous reputable persons in the teaching profession for the purpose of obtaining by mail loans from two out-of-state companies which specialized in making such loans to teachers; forging the names of such persons to applications, postal card messages, money order requests and other papers.

In his opening statement to the jury, J. Raymond Gordon, counsel for Hamilton (not, as has been pointed out, the attorney who now represents him), said that Hamilton's defense would be that the loans were not fraudulently procured in that Hamilton intended to repay all loans in full and had in fact kept up the payments as they fell due, at least in part.

The Government proceeded to examine its witnesses, and when counsel for Hamilton attempted, by cross-examination of government witnesses, to show that payments had been made on the loans, objection was sustained to the questions as being immaterial, the Court stating in effect that payments made by Hamilton could not be used as the basis for a defense, since the substance of the charge was *obtaining* money fraudulently by use of the mails. This action of the Court naturally left Hamilton without any announced defense admissible by the Court except his plea of not guilty.

The Government's case went forward slowly, due apparently to the fact that the United States Attorney felt that each separate document forming the chain of proof should be shown by ample circumstantial evidence to be in Hamilton's handwriting.

Then, in an effort to save time, the United States Attorney, in an unreported chambers conference proposed by counsel for Hamilton at which Hamilton and his attorney were present, suggested that since the *only* defense was that Hamilton had made payments on the loans according to their terms the Government be not put to the trouble of proving his handwriting on the documents by expert testimony, but that it be exhibited to him for identification of his own handwriting. Hamilton and his attorney refused to agree to this procedure.

The Court thereupon in the presence of the jury made substantially the same suggestion with reference to Hamilton's admitting or denying the handwriting, first telling the jury that his attorney was not willing to make the admission. This statement of the Court was duly objected to by Hamilton's attorney but the Court overruled the objection. The reporter's record of this phase of the trial is as follows:

"The Court: Gentlemen of the Jury, it has been suggested to the Court, in a conference in Chambers, that the government now expects to proceed to introduce a large number of specimens of handwriting, or of papers, which they intend to prove by witnesses are in the handwriting of the defendant. The Court, of course, as in all these cases, wants to shorten the trial by reason of the time consumed and the expense.

"The defendant and his counsel have been asked by the government whether it is admitted that he wrote these documents and he has stated, or rather his counsel has stated that he isn't willing to admit that he wrote these documents. Now the Court is going to ask the defendant, himself, right now, whether he does or does not admit that he wrote these various pieces of writing which, I presume, he has seen? Have they been exhibited to him, Mr. Thompson?

"Mr. Thompson: No, Your Honor, they have not been exhibited to him at this time.

"The Court: I suggest then that, as a method of proving these pieces of writing, that you produce your witness and before you undertake to do any proving, examine the defendant and ask him whether he does or does not—

"Mr. Gordon: (Interrupting) Your Honor, I want to object to the Court mentioning this in the presence of the jury.

"The Court: Well, your objection is overruled. We will proceed with the trial.

"Mr. Gordon: Let me have my record on it.

"The Court: All right.

"Mr. Gordon: I want to object to your procedure of asking this man anything, as a violation of the Constitution of the United States which does not compel him to be a witness against himself and I want the law of this procedure, I want to have an objection on that ground, and then you may proceed, Mr. Thompson.

"Mr. Thompson: As I understand, it is not to testify but willing to admit it without testimony.

"The Court: That is right. The Court simply overrules the objection now and, in view of the fact that no admission has been made, the Court will permit you to go ahead with your testimony as you choose to do.

"Let me make this further explanation to the jury:

"There is a plea of not guilty in this case; the plea of not guilty denies every allegation that is made in the indictment and when that plea is entered it becomes the burden of the government to prove all these allegations beyond any reasonable doubt and that is why the suggestion was made as to the authenticity of the writings; but, in the absence of admission by the defendant that the writing is his, it is necessary for the government to prove beyond a reasonable doubt that that is so and the defendant is under no obligation whatsoever to say anything about it—either to deny or admit it."

Besides the foregoing explanation given by the Court to the jury immediately after making the unfortunate suggestion, the Court in its charge to the jury went into much detail in an effort to dispel from the minds of the jury any prejudicial inferences. This is shown by the following excerpt from the charge:

"One other thing that I should say to the jury: it was argued to you by Counsel for the defendant that the defendant hadn't had a fair trial and one of the reasons given was that he felt that he had been called upon to give evidence.

"You will remember what happened in that respect in the trial: In the beginning, Counsel for defendant said to you, in his opening statement, that the defense in this case would be that the loans had been repaid and therefore nobody was defrauded. Now I didn't permit that defense to be made because in the Court's view of the law, it wasn't an admissible defense; it was offered and the Court refused to permit it to be made. But, in view of that statement in the opening statement, it was thought by Counsel for the government and also by the Court, when brought to the

Court's attention, that probably there would be no question raised as to the actual procurement of these loans by the defendant and in order to shorten the case the suggestion was made by the Court that when one of these files was produced that it first be shown to the defendant so that if the defendant said that he procured that loan, then there would be no reason for the government to take up our time with proving it.

"I say that suggestion was made and immediately Counsel for defendant made an objection saying that his client was being required to give testimony. Now a defendant is never required to give any testimony against himself. If you Gentlemen of the Jury got any impression whatsoever that there was any effort being made to have the defendant give testimony, then you should get that out of your minds; I told you so at the time and I tell you again now that it is the government's obligation to prove the defendant guilty 'beyond a reasonable doubt.' The defendant doesn't need to prove that he is not guilty; he is not required to say anything and insofar as there may have been any implication there that the defendant was being required to make some statement then the Court wants to say to the jury that the defendant can't be required to say anything and it wasn't in the mind of the Court defendant would be required to say anything if did not want to.

"Now you are not to feel, from anything that happened there, that any unfavorable inference whatsoever should be raised in your minds against this defendant. He is entitled to his presumption of innocence until he is found guilty beyond a reasonable doubt by the evidence and it is the burden of the government to show you that evidence and the defendant has no burden or responsibility at all."

The following statements and rulings were also made in the course of the trial as shown by the transcript. They relate to the argument to the jury of Philip A. Baer, Assistant United States Attorney:

"Mr. Baer: * * * I don't think it is particularly necessary for me to try to go over all the evidence of these thirty or forty witnesses. It is not denied that this man made these loans and got this money. It is not denied that he had these post office boxes at every little post office, half a dozen or more little post offices around here in this vicinity and going as far south of here as Williamson, West Virginia; that this defendant used the names of people that he knew, who had good credit, teachers for the most part, principals of schools and people who lived in that vicinity; that he got the names of these people and that he wrote to these two loan companies in Iowa; that he filled out the applications that you have seen in these government exhibits here and used the credit and the names of good substantial people in his neighborhood for the purpose of borrowing money. He didn't do that just once but he did it time after time. That isn't denied (the people whose names were used) and I don't believe any reasonable person could doubt that they are the ones, the ones that appeared here on the witness stand. They came in and told you they didn't make any of these loans, the majority of them didn't even know this defendant: their exact names were either used or they were so identified by the application that there was no doubt. The reason they were identified so we know who they are, this defendant had to so identify them in order that when they were checked by the loan company and it came back through here, they could be identified as these particular people around here, of good reputation, so the loans would go through. He couldn't write out there and give a purely fictitious name and name some references and expect for people to come back here and o. k. them—president of a Board of Education, superintendent of a school, good substantial people aren't going to write back and o. k. the credit of a person they don't know.

"That is the reason this defendant used the names of these people, for the purpose of getting this money, and there has been absolutely no explanation made here, I mean there has been no denial made by this defendant that he received every bit of this money.

"Mr. Gordon: Your Honor, we object to that.

"The Court: I think it would be more exact to say 'no evidence.' A plea of not guilty is a general denial, of course.

"Mr. Gordon: I want to object to that argument and I move the Court to declare a mistrial for the reason that the Assistant District Attorney has now commented on the fact that this defendant did not take the Stand in his own behalf.

"The Court: Overruled."

■ Objective consideration of the Court's statement made in the presence of the jury leaves no room for doubt that it was a breach of the privilege given to Hamilton by the Fifth Amendment to the Constitution of the United States. It is there stated that no person "shall be compelled in any criminal case to be a witness against himself * * *." The leading case of McKnight v. United States, 6 Cir., 115 F. 972, makes it clear that actual compulsion is not essential, but that the right is violated by any official suggestion that a defendant take the stand or make admissions. See Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

Plainly, the Court committed error. Clearly the error was prejudicial, if not adequately corrected.

■ I think this error was rendered harmless by the Court's statement to the jury at the time, followed later by the charge, in which the Court went to great length in explaining that no unfavorable inference was to be drawn against Hamilton because of his failure to admit or deny that the handwriting was his.

Counsel for Hamilton relies strongly upon the McKnight case. There the trial judge permitted the United States Attorney to demand of the defendant, over his objection and in the presence of the jury, production of an incriminating paper. On appeal it was held that this was a violation of defendant's privilege of immunity secured by the Fifth Amendment. The error, said the appellate court, could be cured, if at all, only by a clear and emphatic statement by the court that the jury should attach no importance whatever to the failure of the defendant to comply with the demand. This had not been done. The case was therefore reversed.

On the other hand, the error is held to be harmless in those cases in which the jury are immediately instructed to disregard such requests. United States v. Rosenstein, 2 Cir., 34 F.2d 630; McDonough v. United States, 9 Cir., 299 F. 30.

The Court itself being the author of the suggestion that Hamilton be asked to make admissions, the error was more serious than if the proposal had come from another source. However, I believe that the explanation immediately made by the Court, followed later by the emphatic language of the charge, was enough to neutralize its effect, and to divest the error of its prejudicial force.

The comment by government counsel on Hamilton's failure to testify, while less serious in its nature than the Court's error already discussed, was more injurious in its effect, because it went unrebuked by the Court. It is obvious from the record that the Court attached little importance to the remarks at the time, yet when read in the reporter's transcript they are manifestly prejudicial. I refer in particular to the words, "I mean there has been no denial made by this defendant that he received every bit of this money." The only effort made by the Court to correct the impression which may have been produced in the minds of the jurors by these words of government counsel was to say: "I think it would be more exact to say 'no evidence'. A plea of not guilty is a general denial, of course."

This was not enough. All the cases which I have examined are to the effect that nothing less than a sharp, immediate and emphatic rebuke by the Court, together with an admonition to the jury to disregard the remarks, can dispel the injurious effect of such a reference as was made here to Hamilton's failure to testify. Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650; De Mayo v. United States, 8 Cir., 32 F.2d 472. It was all the more necessary in the instant case because counsel's remarks gained added emphasis from the thoughtless error already committed by the Court, which, though as I believe

sufficiently corrected so that in itself it would not be prejudicial, might very probably lend weight to similar utterances on the part of government counsel.

■ I have found no precedent for the proposition that comment by a government attorney on an accused's failure to testify is a breach of the constitutional privilege regarding self-incrimination. Authority, of course, is ample to support the privilege but all such authority is based on a federal statute guaranteeing such immunity, 18 U.S.C.A. § 3481, and not the Constitution. If it be a breach of statutory immunity only, it cannot be used as a weapon in a collateral attack upon a judgment of conviction.

In the case of Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 1674, 91 L.Ed. 1903, the Supreme Court had under consideration a California statute whose validity was challenged on the theory that it was in contravention of the Fifth Amendment. The statute provided *inter alia* that a prosecutor might comment on "The failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him". Mr. Justice Reed, speaking for the Court, said: "We shall assume, but without any intention thereby of ruling upon the issue, that permission by law to the court, counsel and jury to comment upon and consider the failure of defendant 'to explain or to deny by his testimony any evidence or facts in the case against him' would infringe defendant's privilege against self-incrimination under the Fifth Amendment if this were a trial in a court of the United States under a similar law."

Mr. Justice Reed then went on to hold that the protection afforded a defendant by the Fifth Amendment against being compelled to be a witness against himself is effective only insofar as federal action is concerned. The result was to uphold the validity of the California statute. In a short but forceful dissenting opinion in this same case, Mr. Justice Murphy pointed to the reasons why comment by a prosecutor on a defendant's failure to testify is an indirect compulsion exercised upon him.

These reasons are, according to Mr. Justice Murphy:

"1. If he does not take the stand, his silence is used as the basis for drawing unfavorable inferences against him as to matters which he might reasonably be expected to explain. Thus he is compelled, through his silence, to testify against himself. And silence can be as effective in this situation as oral statements.

"2. If he does take the stand, thereby opening himself to cross-examination, so as to overcome the effects of the provision in question, he is necessarily compelled to testify against himself. In that case, his testimony on cross-examination is the result of the coercive pressure of the provision rather than his own volition."

■ I recognize, of course, that these statements in a dissenting opinion are of no value as precedent to support the proposition advanced; but they are in no way in conflict with the decision in the case, and they are so patently true that I am constrained to agree. The fact that here the comments were made in the closing argument after the evidentiary part of the trial had ended does not diminish their applicability, but rather enhances it. Here the defendant is left without the alternatives suggested by Mr. Justice Murphy, and, while suffering the full impact of their implications, is compelled to sit in silence with no other recourse than to object to the statements made.

To say that Hamilton's guilt was proved by overwhelming evidence is no answer to his complaint that his constitutional privilege of immunity from self-incrimination was invaded. Obviously, had the government not made out a persuasive case by the testimony of its witnesses, there would have been no point to the argument of its counsel (in effect) that Hamilton admitted the truth of the witnesses' statements by failing to deny them. The stronger the evidence is against a defendant, the more damaging may be statements calling attention to his failure to deny any of it.

■ The Bill of Rights secures liberties which are sacred and inviolable. An

uncorrected transgression of its commands or prohibitions ought not to be weighed and measured by the degree of force with which it may impinge upon a given situation. If the violation is clear, the remedy should be applied. Otherwise the privileges and immunities secured by the Bill of Rights may be gradually eroded by the judicial improvisations that would inevitably flow from a system whereby the right is gauged according to the person involved or the circumstances of the particular case.

I am compelled to conclude that, because of the Court's omission in not rebuking government counsel for his remarks concerning Hamilton's failure to testify, and the Court's further omission of any instruction to the jury to disregard the statements, Hamilton was deprived of an important constitutional privilege. As a result, he did not receive the fair and impartial trial which is guaranteed to every defendant.

The motion to vacate the judgment and sentence will be sustained. Thereupon the Court will entertain a motion to set aside the jury's verdict and award the defendant a new trial.