## UNITED STATES v. ROCCO.

Cr. E–5016.

United States District Court
W. D. Pennsylvania.

Aug. 3, 1951.

Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Vincent M. Casey, and Harry Savage, of firm of, Casey Power & Savage, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

In this case, the jury found the defendant guilty of eighteen counts contained in an indictment. Nine counts charged that he transported or caused to be transported stolen securities in interstate commerce in violation of the provisions of 18 U.S.C. (1946 Ed.) § 415, 18 U.S.C. § 2314; and nine counts charged that he sold these securities in violation of the provisions of 18 U.S.C. (1946 Ed.) § 416, 18 U.S.C. § 2315.[1]

Defendant moved for judgment of acquittal or in the alternative for a new trial under Federal Rules of Criminal Procedure, rules 29 and 33, 18 U.S.C. In my opinion, the motions should be denied.

It was shown by the Government that four groups of securities of the face value of $240,225 disappeared from four different financial institutions located in states other than Pennsylvania. After their disappearance and on various dates in the year 1948, defendant sold all or a part of each group of these securities. The proceeds amounted to $181,600 plus interest.

On May 2, 1944, Home Owners' Loan Corporation bonds in the sum of $100,225 disappeared from the Bank of America in Los Angeles, California. They were owned by the Bank. On September 28, 1948, and on October 25, 1948, some of these bonds, in the sum of $57,600, were sold by defendant through the First National Bank of Indiana, Pennsylvania.

On May 15, 1945, United States Treasury bonds in the sum of $100,000 disappeared from the Union National Bank in Newark, New Jersey. On March 16 and 24, and April 5 and 12, 1948, some of these bonds, in the sum of $79,000, were sold by the defendant through the Homer City Bank of Homer City, Pennsylvania. On September 10, 1948, defendant sold an additional $5,000 of these bonds through the First National Bank of Indiana, Pennsylvania. These bonds were owned by Morris Kessler ($24,000) and Samuel Hirsch ($76,000), both of whom had taken the bonds to the Bank for sale.

On July 21, 1948, West Penn Power Company bonds in the sum of $20,000 disappeared from Blyth and Company, New York, New York, and were sold by defendant on September 10, 1948, through the First National Bank of Indiana, Pennsylvania. Blyth and Company owned these bonds.

On September 17, 1948, United States Treasury bonds in the sum of $20,000 disappeared from Modern Industrial Bank, New York, New York, and were sold by defendant on October 20, 1948, through the First National Bank of Indiana, Pennsylvania. Henry Puchall owned these bonds and had taken them to the Bank as collateral for a loan.

The Home Owners' Loan Corporation bonds had been called on May 1, 1944. The Treasury bonds and West Penn Power Company bonds were unmatured coupon bonds payable to bearer.

Without detailing the interesting events in each case, it is sufficient to observe that

---

1. Defendant was indicted on 30 counts, of which 12 were withdrawn from the jury. Of the remaining counts, Nos. 4, 7, 10, 13, 16, 19, 22, 25, and 28 charged transportation, and counts Nos. 5, 8, 11, 14, 17, 20, 23, 26, and 29 charged selling.

all the securities mysteriously disappeared during business hours almost from under the eyes of their custodians. Defendant did not deny that the majority of the bonds turned up in his possession and did not deny that he sold them. Although defendant is, not required to take the stand in his own defense and his failure so to do raises no presumption against him, the failure to testify does not raise a presumption in his favor. The jury, if it believes the testimony of the witnesses for the prosecution, may draw whatever inferences the testimony of the witnesses reasonably tends to substantiate. The jury would have been naive indeed if it had found from the evidence that all four of these disappearances, involving over $200,000 in bonds, were due to fortuitous circumstances instead of from theft, conversion, or fraud as charged. This is especially true when, without explanation, over $180,000 of the bonds eventually gravitated from four widely separated institutions into the possession of this defendant at his home in Homer City, Pennsylvania.

■ Also, in view of this evidence, the jury was warranted in finding that the possession of these securities by defendant was not purely coincidental or a mere happenstance. From that possession and the furtive manner of disposition of some of the bonds, as hereinafter set forth, the jury was justified in inferring that the defendant knew that the bonds were stolen and that, at least, he had aided and abetted or caused [2] them to be transported in interstate commerce. The sale of the bonds from each purloined group by this defendant was evidence to show that he was part of a fraudulent plan, scheme, or design to dispose of stolen securities, and a strong inference of guilty knowledge arose from this possession alone. By circumstantial evidence, a strong prima facie case was proved showing that the bonds were stolen, that they were transported in interstate commerce, and that defendant knew they were stolen, converted or

taken by fraud. There was overwhelming direct evidence that he sold these bonds and received the proceeds. When he failed to take the witness stand and explain his possession, he could hardly expect the jury to draw inferences in his favor and acquit him.

In addition, it is apposite to note that after he had sold bonds in the amount of $79,000 in March and April of 1948 through the Homer City Bank, where he was well known, and after he had priced $20,000 of West Penn Power Company bonds and some Home Owners' Loan Corporation bonds [3] and indicated an intention to sell them at the same Bank, he went to Indiana, Pennsylvania, six miles away, where he is not so well known, and, through an attorney and director of the First National Bank in that city, in September and October of 1948, sold the $20,000 of West Penn Power Company bonds, $57,600 of Home Owners' Loan Corporation called bonds, as well as $25,000 of Treasury bonds. The natural inference arises that he suspected that the cashier of the Homer City Bank was suspicious of the ownership of these bonds, which was the fact.

■ At the trial, defendant objected to the attorney's evidence on the ground of privilege. Since it appeared obvious that there was no attorney-client relationship but instead it was merely that of an agent to sell bonds [4] in furtherance of future wrongdoing, that objection was overruled. See 8 Wigmore on Evidence, 3rd Ed. Sections 2296, 2298; Rule 212, American Law Institute's Model Code of Evidence; S. E. C. v. Harrison, D.C.Dist.Col.1948, 80 F.Supp. 226, 230. Defendant had already learned from the cashier of the Homer City Bank that the called H.O.L.C. bonds were saleable. He also knew from previous experience that it was not difficult to sell Treasury bonds directly through banks. No legal advice was necessary from the attorney and none was given.

2. See 18 U.S.C. § 2(a, b).

3. The cashier of the Homer City Bank testified that defendant told him on August 3, 1948, that a friend of his in New York had a considerable amount of H.O. L.C. bonds and $20,000 of West Penn Power Company bonds.

4. The attorney characterized the relation as attorney and client.

It did not appear that this attorney made any reasonable inquiry as to the source of ownership by the defendant of these bonds, although the circumstances clearly called therefor. But even if I was mistaken in admitting this testimony, the matter was not pressed, either in the motions or at oral argument or in the briefs, and I deem the point waived. See Ace Grain Co., Inc., v. American Eagle Fire Ins. Co. of New York, D.C.S.D.N.Y.1951, 95 F. Supp. 784, 786.

The foregoing, I think, disposes of defendant's contentions that there was insufficient proof that the bonds were stolen, converted or taken by fraud. It also disposes of his contention that he was an innocent holder in due course for value of negotiable securities without notice. Unexplained, he was anything but an innocent holder in due course for value under the circumstances as proved. He had it in his power to explain his possession if he fitted that description, but he chose to remain silent.

■ Defendant also attacks his conviction on the ground that the interstate character of the securities had terminated at the times they were sold. Here again, from the circumstances, the jury could infer that he transported or was instrumental in transporting these securities from the place of theft into Pennsylvania for sale at or about the time they were sold. Adapting McNally v. Hill, 3 Cir., 1934, 69 F.2d 38, it is certain that there comes a time in the transportation of stolen securities from one state to another when transportation ceases. If, at that moment, they lose their quality of "moving as," or "which are a part of" or "which constitute" interstate commerce, then always it would be impossible to enforce the statute against the sale or disposition of stolen securities. Plainly the statute contemplates a situation where the sale is an incident to the theft and transportation which preceded it, and when the sale is so tied up with the interstate transportation in furtherance of the scheme to unlawfully dispose of the stolen securities and constitutes the last step thereof, the characteristic of interstate commerce is preserved and the federal jurisdiction for trying the offense of sale or disposition is maintained.

■ At the trial, defendant objected to the cashier of the Homer City Bank testifying to a conversation which he had with defendant insofar as that conversation related to bonds which defendant stated his friend had in his possession in New York. This evidence was certainly relevant to the issues involved and the objection is without merit.

■ Objection was made to that part of the charge which related to the inference of guilt which can be drawn from possession of the fruits of crimes recently committed, unless explained by the circumstances or accounted for in some way consistent with innocence. I think this objection is without merit. See Rosen v. United States, 2 Cir., 1920, 271 F. 651; United States v. Segelman, D.C.W.D.Pa. 1949, 86 F.Supp. 114. As stated, defendant made no effort to account for his possession of all the bonds. Possession of the fruits of four crimes would not be consistent with innocence, nor would the circumstances of the disposal of some of the fruit. Although the attorney who sold the bonds for defendant stated the latter told him he had won some securities through gambling, it was for the jury to decide whether the inference was overcome. The jury was instructed that the inference fades with lapse of time and was a weak one as applied to the bonds taken in 1948 and sold a month or two later; and that no inference could be drawn from possession of the bonds taken in 1944 and 1945 and sold in 1948. It may have been error not to charge that, without explanation, an inference of guilt arose from possession of H.O.L.C. bonds called on May 1, 1944, and stolen on May 2, 1944, and although non-interest bearing, retained for four years. But if such was error, it was in the defendant's favor, of which he does not complain.

■ During the course of the charge, reference was made to certain testimony not being denied. Defendant contends that such statements have prejudiced his right to remain mute without adverse comment. I believe the law is well settled

that if the case, as made out for the Government, is of such a nature as to warrant an inference of guilt, unless there is some contradiction by witnesses, the rule does not prevent the jury from considering the lack of contradiction on the part of witnesses for the defense. Jenkins v. United States, 4 Cir., 1932, 58 F.2d 556, certiorari denied, 1932, 287 U.S. 622, 53 S.Ct. 21, 77 L.Ed. 540; 22 C.J.S., Criminal Law, § 593. Any conceivable misunderstanding which might have arisen from this instruction was made clear and unequivocal when at the conclusion of the trial, the jury was instructed as follows: "(I)t was called to my attention that I said that certain facts testified to by the witnesses for the Government were not denied. Now, it has been pointed out that you do not need to believe those witnesses, even though there was no denial of what they said. That is true. The credibility and believability of a witness is for you to determine. You can believe everything they said, you can ignore everything they said. That is for you. The mere fact that it was not denied wouldn't help you believe it."

Furthermore, to remove any possible doubt as to defendant's rights, at the beginning of the charge, at the request of defendant, it was said: "The failure of any defendant to take the witness stand and testify in his own behalf does not create any presumption against him; the jury is charged that it must not permit that fact to weigh in the slightest degree against any such defendant, nor should this fact enter into the discussion or deliberations of the jury in any manner." The court, in commenting upon the fact that certain testimony was not denied, was merely summarizing the evidence in the case to clarify the issues for the jury. In view of the foregoing instructions, I believe the jury was adequately informed of the rule of law that no unfavorable inference was to be drawn from defendant's failure to take the stand and that his interests in this respect were fully protected.

 I conclude that the evidence and inferences to be drawn therefrom are sufficient to establish the defendant's guilt beyond a reasonable doubt and the verdict of the jury must be sustained as to each of the eighteen counts of the indictment. Accordingly, the motion for judgment of acquittal and the motion for a new trial are denied. An appropriate order will be entered.[5]

---

5. Since writing the foregoing opinion, counsel for defendant called our attention to United States v. Hamilton, D.C.S.D.W. Va. 1951, 97 F.Supp. 123. In that case the defendant objected to the comment of the prosecuting attorney "that this defendant did not take the Stand in his own behalf." The Court vacated the judgment. In the case sub judice the objection was as follows:

"Mr. Casey: * * * The second exception is to the Court's mentioning that there is certain evidence not denied. The Court has said that several times during his charge. And with specific reference also to the conversation of August 3, 1948, which the Court also mentioned was not denied.

"The Court: Isn't that true?

"Mr. Casey: That is not the province of the Court or anybody else. Even if the witnesses do say it, the jury doesn't necessarily need to believe them and the denial has nothing to do with it. I will cover that. I was just going to say it when the jury walked out, that because a witness has testified, that does not make it so."

The Court then instructed the jury as quoted first in the above opinion.

Counsel, as well as the Court, viewed the references to undenied evidence as comment upon the credibility of the witnesses whose testimony the Court had summarized, and not as adverse comment upon defendant's failure to take the stand in his own behalf. If the latter view was not apparent to counsel at that time, I am convinced that it was not apparent to the jury, and that defendant was not prejudiced in this respect.

But had my attention then been directed to the possibility that the jury might have construed the references as commenting adversely upon defendant's failure to take the stand I would have been given the opportunity of at least reaffirming the admonishment quoted second in the above opinion. See Federal Rules of Criminal Procedure, rule 30, 18 U.S.C.

In my judgment the reasons for vacating the sentence in the Hamilton case are not apposite in this case.