James Broadus CRAWLEY, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 7862.

United States Court of Appeals
Fourth Circuit.

Argued June 9, 1959.

Decided June 19, 1959.

See, also, D.C., 23 F.R.D. 215.

W. E. Bowen and J. G. Leatherwood, Greenville, S. C., for appellant.

W. A. Bull, Asst. U. S. Atty., Greenville, S. C. (Joseph E. Hines, U. S. Atty., Spartanburg, S. C., on brief), for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and BARKSDALE, District Judge.

HAYNSWORTH, Circuit Judge.

The defendant appeals from a conviction upon three counts charging him with entry into the Donaldson Air Force Base Branch of The Peoples National Bank of Greenville (South Carolina), and the

removal, possession, storage and disposition of the stolen money. He contends that the jury's verdict rests upon speculation and that the evidence is insufficient to support it.

Sometime during the night of June 30—July 1, 1958, there was a forceful entry of the Donaldson Air Force Base Branch of the bank. The safe was ripped open and approximately $75,000 in currency, which had been stored in the safe, was stolen. No one saw the entry, and there is no direct evidence placing the defendant, or any other individual, at the scene of the crime that night.

June 30, 1958 was a payday for the air force personnel at Donaldson. In anticipation of the need of currency to cash the checks of the base personnel, the manager of the branch placed an order with the main office of the bank in Greenville for $212,100, to be delivered to the Donaldson branch on the morning of June 30. Accordingly, there was a delivery that morning from the central office to the Donaldson branch of $10,000 in used $100 bills, $130,000 in new $20 bills, $40,000 in new $10 bills, $20,000 in new $5 bills, $8,000 in used $1 bills, and smaller amounts in coin. During the preceding business day, the main office of the bank had received from the Federal Reserve Bank $290,000 in currency, being $10,000 in used $100 bills, $200,000 in new $20 bills, $40,000 in new $10 bills and $40,000 in new $5 bills. The testimony shows that all of the new bills delivered to the Donaldson branch on the morning of June 30 came out of the currency delivered by the Federal Reserve Bank to the central office of The Peoples National Bank on June 28, and the numbers of the new bills are established, since each "brick" of new bills was identifiable and the numbers of the bills in each brick, being in sequence, ascertainable.

The numbers on the used bills in denominations of $100 and $1 in the Donaldson branch at the close of business on June 30 are not ascertainable or proven.

At the close of the preceding business day, the Donaldson branch had on hand $14,658.60 in currency. During the business day of June 30, the Donaldson branch received deposits and paid out currency in substantial amounts, so that it had on hand, at the close of business on that day $80,422.30 in currency. This amount included all of the $10,000 in used $100 bills received that morning,[1] and several packages of used $1 bills, upon the wrapper of which there appeared the name of Pet Dairy and the initials of a teller in the central office of The Peoples National Bank. There was testimony that Pet Dairy, a customer of the bank, packaged currency for deposit, the $1 bills being made up in packages of fifty bills each; the name of the dairy appeared on the wrapper and, when received for deposit, the wrapper was initialed by the receiving teller. The wrappers on the packages of Pet Dairy bills in the Donaldson branch at the close of business on June 30, 1958, bore the initials "D.M.G.," being those of a teller in the main office of the bank.

The defendant, Crawley, was a resident of Spartanburg, approximately thirty miles from Greenville. Except for a few odd jobs, he had no apparent gainful employment for a number of years, though for a period of a few weeks, ending two or three weeks preceding his arrest on July 18, 1958, he had operated, as sublessee, a tavern in Greenville, selling his interest at the end of his short period of operation for $200. Early in July 1958, Crawley began to spend substantial sums of cash. He went to Charlotte, North Carolina, where, on July 7, he purchased a trailer for $4800, pay-

---

1. At the close of business on June 30, 1958, there was on hand in the Donaldson branch $12,000.00 in "big money." Of this $10,000.00 was represented by the unbroken package of one hundred $100 bills received that morning, but the testimony does not disclose how the remaining $2,000.00 was divided as between $100 bills and $50 bills. This $2,000.00 in large denominations was composed of bills on hand at the close of business on June 27, 1958 as possibly supplemented by cash deposits on June 30, 1958.

ing for it with forty-eight $100 bills. At various places, he bought jewelry, bedding, a sewing machine, a vibrator chair, a television set, a ladies watch and various other articles.

Crawley was arrested on July 18, 1958, after investigation of his negotiation of a number of new bills bearing numbers which identified them as having been among currency delivered by the Federal Reserve Bank to The Peoples National Bank on June 28, 1958. Other such bills, in sequence, were found in his possession at the time of his arrest. All of the currency found in his possession at the time of his arrest was seized, but, after his release on bail, he negotiated still more bills bearing numbers which identified them as coming from the same shipment from the Federal Reserve Bank.

There were traced to Crawley one hundred and one used $100 bills and two packages, containing fifty $1 bills each, in a wrapper bearing the name, "Pet Dairy," and the initials "D.M.G.," and the date, May 9, 1958. The new currency in his possession at the time of his arrest, or negotiated by him, included fifty-three new $5 bills bearing numbers identifying them with the shipment from the Federal Reserve Bank of June 28 and several bills in $20 and $10 denominations, which could be similarly identified.

Among the bills found in his possession at the time of his arrest, or shown to have been negotiated by him, was one sequence of twenty-three $5 bills bearing consecutive numbers, another consecutive sequence of fourteen such bills and another of eleven such bills. The testimony shows that, both prior to and after his arrest, he spent sequences of consecutively numbered $5 bills, all traceable to the same shipment from the Federal Reserve Bank.[2]

After the Government had introduced testimony establishing the facts briefly summarized above, the defendant offered no evidence. No attempt was made to explain his affluence after a long period without apparent gainful employment, nor was any explanation offered by any witness of his possession of the particular bills found in his possession, or shown to have been spent by him before and after his arrest.

In support of his position, Crawley points to the fact that it is not shown with mathematical certainty that the new $20 and $5 bills traced to him were ever in the Donaldson branch of the bank, for, though they were identified as having been in the shipment of currency from the Federal Reserve Bank on June 28, less than all of the bills of those denominations in that shipment were sent to the

2. The following table shows the new bills identified by their numbers as a part of the shipment from the Federal Reserve Bank to The Peoples National Bank on June 28 and which were traced to Crawley:

New $5 Bills—53

| | | | |
|---|---|---|---|
| 5 bills | E 09624532—36 B | 7–14–58 | Brother Sewing Center |
| 6 bills | E 09624537—42 B | 7–15–58 | Martin Hardware Company |
| 14 bills | E 09624554—67 B | 7–18–58 | Crawley's possession |
| 20 bills | E 09630351—70 B | 7–18–58 | Crawley's possession |
| 3 bills | E 09630371—73 B | 12–2–58 | The Vogue |
| 1 bill | E 09630376 B | 12–23–58 | H. W. Lynch |
| 1 bill | E 09630379 B | 11–12–58 | The Vogue |
| 1 bill | E 09630452 B | 11–12–58 | The Vogue |
| 2 bills | E 09630534—35 B | 1–2–59 | T. M. Ackerman |

New $10 Bills—3

| | | | |
|---|---|---|---|
| 1 bill | E 40060781 B | 12–23–58 | H. W. Lynch |
| 1 bill | E 40060784 B | 12–2–58 | The Vogue |
| 1 bill | E 40063566 B | 7–14–58 | Brother Sewing Center |

New $20 Bills—3

| | | | |
|---|---|---|---|
| 1 bill | E 27552331 B | 1–12–59 | The Vogue |
| 1 bill | E 27552464 B | 2–13–59 | C. E. Robbs |
| 1 bill | E 27552486 B | 2–13–59 | Dr. Arrants |

Donaldson branch. The testimony definitely places the $10 bills in the Donaldson branch on the morning of June 30, but, he says, the branch paid out large amounts of currency that day, and many innocent people might be found to have been in possession of three of them. He further points out that many of the new $5 and $20 bills, received from the Federal Reserve Bank on June 28, were paid out by the Donaldson branch and the central office of the bank, and he contends that possession of some of such bills, indistinguishable from many others in the channels of commerce, is insufficient to support an inference of guilt of the specific charges of the indictment.

There is no question but that mere proof of possession of one or a number of new bills identified with the shipment from the Federal Reserve Bank on June 28 would not support an inference of wrongdoing.

Much more than that was shown here, however. Crawley possessed a large number of such bills, many of them in consecutively numbered sequences, and he had no new currency which was not identified with the shipment from the Federal Reserve Bank on June 28. Furthermore, the one hundred and one $100 bills traced to him, while not individually identifiable, approximated the number of such bills shown to have been in the Donaldson branch the night of the robbery, and the packages of $1 bills, in Pet Dairy wrappers bearing Miss Green's initials, found in Crawley's possession were entirely similar to packages shown to have been in the Donaldson branch on the night of the robbery. In the light of Crawley's sudden affluence and in the absence of any other explanation of his possession of this money,[3] these facts,

considered collectively, show a strong probability that the currency was removed from the Donaldson branch during the robbery.

Though we assume that any one of these facts, considered alone, was insufficient to support a verdict of guilty, there is no requirement that the criminating evidence come from the mouth of one witness or spring from one item of circumstantial evidence. On the motion to acquit, the District Judge, as we must, looked at all of the circumstances, which collectively create much more than a speculative possibility of guilt. In their sum, they raise a strong probability of guilt which only the most incredulous would fail to recognize. It is the sort of reasonable probability which the jury must weigh and upon the basis of which juries routinely act.

It is true that the evidence does not demonstrate guilt with mathematical certainty, but no burden to produce proof of that quality is placed upon the prosecution. The proof cannot be said to be as consistent with innocence as with guilt; indeed imagination falters when seeking some innocent means by which Crawley might have come into possession of these particular bills and wrappers. If it were true that circumstantial evidence warrants its submission to the jury only when it excludes every reasonable hypothesis consistent with innocence,[4] the evidence here meets that standard, for no such reasonable hypothesis is suggested.

The question is not whether the evidence forecloses all possibility of doubt in the mind of the court, but merely whether the evidence, construed most favorably for the prosecution, is such that a jury might find the defendant

---

3. When arrested, Crawley told an agent he did not wish to show the FBI his cards, but would keep them to play in court. At the trial, he offered no testimony. His failure to offer himself as a witness cannot support an inference adverse to his interest, but the total absence of any explanation to rebut the prosecution's prima facie case is a circumstance which need not be ignored.

See Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Jenkins v. United States, 4 Cir., 58 F.2d 556; Drew v. United States, 2 Cir., 27 F.2d 715; United States v. Laurito, D.C. W.D.Pa., 126 F.Supp. 116; United States v. Rocco, D.C.W.D.Pa., 99 F.Supp. 746.

4. Cf. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150.

**812**

guilty beyond a reasonable doubt. Bell v. United States, 4 Cir., 185 F.2d 302;' United States v. Brown, 2 Cir., 236 F.2d 403; Stoppelli v. United States, 9 Cir., 183 F.2d 391. Judge Soper, speaking for this Court in the Bell case said of our duty of appraising the sufficiency of the evidence [185 F.2d 310]:

" * * * That responsibility does not include a finding as to whether the defendant is guilty beyond a reasonable doubt. When a motion for a directed verdict of acquittal is made in a criminal case, the sole duty of the trial judge is to determine whether there is substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt. The possibility that a jury may have a reasonable doubt upon the evidence as to the guilt of the defendant is not the criterion which determines the action of the trial judge. The decision on that question is for the jury to make and the rule is the same whether the evidence is direct or circumstantial. * * * "

█ While Crawley was not seen in the vicinity of the bank, the air base is not so protected as to be inaccessible to a member of the public bent upon bank robbery. Crawley was not shown to have been elsewhere. Where the defendant had an opportunity to commit the crime, similar evidence in similar factual situations has been held sufficient to support convictions. United States v. Howell, 3 Cir., 240 F.2d 149; Hansbrough v. United States, 8 Cir., 156 F.2d 327; Husten v. United States, 8 Cir., 95 F.2d 168; United States v. Rocco, D.C.W.D.Pa., 99 F.Supp. 746.

█ Complaint is also made of the receipt in evidence of one of the $10 bills, for it was not positively shown that it, rather than another $10 bill, was the one negotiated by Crawley. The objection goes to the weight of the evidence rather than to its admissibility.

Affirmed.