UNITED STATES of America,
Appellee,

v.

J. Thomas ELLICOTT, Lewis L. Fleury,
and Harvey C. Jones, II, Appellants.

UNITED STATES of America,
Appellee,

v.

Lewis L. FLEURY and Harvey C. Jones,
II, Appellants.

UNITED STATES of America,
Appellee,

v.

J. Thomas ELLICOTT, Appellant
(two cases).

Nos. 9052, 9106, 9111, 9317.

United States Court of Appeals
Fourth Circuit.

Argued April 30, 1964.

Decided Sept. 14, 1964.

Leroy W. Preston, Baltimore, Md., for appellant Lewis L. Fleury.

L. Robert Evans, Towson, Md., for appellant Harvey C. Jones, II.

Harris James George, Towson, Md., and Leon H. A. Pierson, Baltimore, Md., for appellant J. Thomas Ellicott.

Benjamin R. Civiletti, Asst. U. S. Atty., and Thomas P. Curran, Atty., Dept. of Justice (Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

Mail fraud was charged to J. Thomas Ellicott, Lewis L. Fleury, and Harvey C. Jones II in an indictment of them as principals and aiders for devising, and furthering by use of the mails, a scheme to defraud two savings and loan associations in Baltimore, Maryland. 18 U.S.C. §§ 1341 and 1342. These appeals against their conviction must prevail, because utilization of the mails to prosper the

plan was not proved beyond a reasonable doubt.

Fleury, a lawyer, in 1961 discovered the Knight and Arpin tracts of land, located in Baltimore County, which although zoned as residential were in fact within an industrial area. Procuring an option or preference to buy them at $31,348.90 and $115,000.00, respectively, he approached Jones, an attorney, who in turn also interested Ellicott in them. Ellicott was actually the owner as well as the president and counsel of both the Monumental City Savings and Loan Association and the First Union Savings and Loan Association. On condition they would participate in any profits, these concerns committed themselves to lend sufficient moneys for the ultimate acquisition of these properties as agreed among Fleury, Jones and Ellicott.

Thereupon Fleury obtained the incorporation of Premier Investment and Realty Company and Jones procured two charters, one for Valley Development Company and the other for Gunpowder Development Company. Through appropriate assignments Premier acquired the option on the Knight tract at $31,348.90, and a contract to buy the Arpin land for $115,000.00. Premier then agreed to sell the Arpin contract to Gunpowder for $67,000.00, Premier at the same time promising to pay all expenses incident to obtaining for Gunpowder a loan not to exceed $260,000.00 on the Arpin tract and to pay advance interest thereon for 18 months. Simultaneously, Gunpowder agreed to sell the Arpin contract to First Union for $184,500.00, and at the same time First Union agreed to resell the Arpin tract to Gunpowder for $256,000.00. The entire amount of the last purchase was to be represented and secured by a loan from First Union to Gunpowder. All these agreements were subsequently consummated in proper conveyances.

Shortly thereafter, December 12, 1961, Premier assigned to Valley for $25,500.00 its option to purchase the Knight property, Premier likewise covenanting to pay the expenses of the procurement by Valley of a mortgage on the Knight property not to exceed $98,000.00 and to prepay 18 months interest thereon. Next day Valley sold the Knight tract to Monumental for $59,000.00. On the same date Monumental contracted to resell this property to Valley for $98,000.00, with the whole purchase price evidenced and secured by a mortgage from Valley to Monumental in that amount. These arrangements were concluded in valid conveyances.

All of these transactions were accomplished, or caused to be accomplished, through the joint personal and immediate action of the accused appellants, the corporations owned or organized by them being simply the respective alter ego of each of them. The moneys for all purposes, including expenses of conveyancing and attorneys' fees, came from the funds of the two associations. Thus, at the sole risk of the associations, Fleury, Ellicott and Jones among themselves drew handsome profits and attorneys' fees. In addition, Jones' corporations without cost to him acquired ownership of the two tracts, subject of course to the mortgages but with the interest thereon partly paid. None of the three new corporations had any appreciable subscribed capital. Ellicott also shared in the real estate commissions on the sales from Knight and Arpin. He made no accounting of his gains or fees to either association.

Aside from the personal advantage to him, the aim of Ellicott was to show a profit upon the books of the associations so as to attract and retain investors. The associations had been running earnings-deficits, and in the summer of 1961 they advertised the payment of 5% dividends. This representation multiplied their deposits. True, the promised dividends were paid in December, 1961 but only on the basis of the paper income derived from sale of the tracts. As entered on the books these were: Monumental $37,449.05 and First Union $68,012.25.

The three counts of the indictment were predicated on the facts just recited,

and differed only in the occasion on which the mail was used to carry out the agreement.

The defendants contended that the sales to and by the associations were at fair and sound valuations—thus that the loans were adequately secured—because of the potential worth of the land when rezoned industrial. Hence, they urged there was no fraud in the scheme. Finally, the specified uses of the mail were explicitly denied.

A jury waived, the District Judge dismissed the first count but convicted on the second and third. He found that together the defendants had planned to defraud, and had knowingly defrauded, the associations by appropriating their moneys to the personal enrichment of the accused; by violating and assisting in violating the fiduciary officer-obligations of Ellicott to the associations; and in not revealing to these institutions the true nature of the so-called profits. Adoption of the mails to these ends was likewise found.

I. The act of mailing in the second count was the deposit by Jones of a letter addressed to the State Tax Commissioner, State Office Building, 301 West Preston Street, Baltimore, Maryland, containing the articles of incorporation of Valley. The office of the Commissioner— State Department of Assessments and Taxation—was located in Baltimore on the seventh floor of the State Office Building, in two rooms. No. 702 was the Charter Department, while No. 703 was occupied for other functions of the Commissioner. Applications for Maryland charters were initiated and processed in this Department.

As the draftsman of the Valley charter, Jones testified that it was not mailed to the Department but was delivered in person between 4:45 and 4:50 P.M., Friday, December 8, 1961. He states he gave it to a woman employee sitting at the customers' desk. His office is in Towson, Maryland, a short distance from Baltimore.

To prove the papers arrived by mail and not by hand delivery, the Government introduced Jones' transmittal letter, dated December 8, 1961 stamped by a date-time machine as received on Monday, "Dec. 11, 9:39 A.M. '61". In addition, every woman working in Room 702 on Friday, December 8, 1961, was called to the stand and none of them could recall Jones' delivery of a letter on that date. Of course, this testimony was not given until the trial, more than a year later.

They unanimously testified to the customary mechanics of handling the mail: that it is brought from the control mail room in the building each morning and put on a central table in Room 702; that an electric envelope-slicing machine and an electric time and stamping machine are on the table; that the envelopes are thus opened mechanically by four women and the contents thus dated; that the documents so received are then given to the appropriate division; that the charters on reaching the review desk are initialed by the reviewer and the time of receipt rubber-stamped thereon as it appears in the stamp of the electric machine; and that the mail is usually assorted and distributed by 10 o'clock each morning.

The electric date-stamping, it was stated, was applied only to those communications which had come through the mail. Any matter otherwise coming in, it was added, was directly referred to one of two examiners and would not be received by any other employee. The Commissioner's office emphasizes the importance of the notation of the hour and day of the receipt of a charter to determine priority as between applicants.

This modus operandi; the early Monday morning hour of the machine-stamping on Jones' letter; the endorsement of the same time on the charter; and the women's testimony that they could not recall a personal delivery on Friday afternoon, December 8, 1961 comprised the Government's proof of Jones' use of the mail.

Independently of Jones' denial, however, the prosecution's case is shaken by proof of this defendant's test of the sys-

tem a year later in preparation for trial. An envelope containing a charter was manually delivered to Room 702 between 4:45 and 4:50 P.M., Friday, November 30, 1962—the hour and day corresponding with the indictment missive's transmission. Though hand-sent it was put through the date-time machine. This tends to disprove the contention that only mail was machine-stamped. Further detraction from the testimony of the exclusive use of the mechanical dater for mail comes from two of the women clerks in Room 702 who said that sometimes they had stamped non-mail letters with the machine. Thus the test-letter was not the only disproof of the uniformity of the practice.

In rebuttal the Government points out that the test establishes that letters are actually dated as received. This, it continues, proves receipt of the genuine letter on Monday by mail, inasmuch as no personal delivery is asserted by Jones for that day.

In argument, the gap between Jones' delivery date, December 8, and the machined date of Monday, December 11, 1961, is suggested by him as due to deferment in processing because of the late Friday hour. Relevant in this connection is the explanation by one of the women in Room 702 that when documents were left there, other than by mail, she would refer them to one of two secretaries to be opened, but just when they would do so was not made clear.

Jones' secretary testified that on Friday, December 8, she wrote the letter of transmittal, which together with the proposed charters she delivered to Jones the same day. She had not prepared the letter for mailing. The envelope was not produced by the Government although the testimony indicated the Department's practice several months earlier had been to retain the covers of such communications.

The District Judge rejected the testimony of Jones and found the letter had reached the Department through the mail. To be sure, it is for the trier of fact, jury or judge, to determine within the limits of the evidence whether there is guilt beyond a reasonable doubt. But we have the duty of insuring that the evidence is of such substance as to allow that choice. In this canvass we, of course, take the proof in the light most favorable to the verdict or finding. If within range of the credible evidence we see substantial foundation for the determination, our obligation ends although on that evidence we might not have made the same decision. Glasser v. United States, 315 U.S. 60, 81, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Crawley v. United States, 268 F.2d 808, 811 (4 Cir. 1959); Stoppelli v. United States, 183 F.2d 391, 393 (9 Cir. 1950), cert. denied, 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631. But if after resolving every conflict for the prosecution, the proof nowhere establishes guilt to the requisite degree, it is no longer a matter of weighing the evidence, for then no crime has been made out. Presently, a lack of proof dictates that determination, and we now so hold.

At most the evidence proved no more than a probability of the use of the mails. Principally, reliance is put on a customary practice in the Charter Department, for no one states Jones mailed the letter. Thus the Government depends merely upon an inference from conventional procedure: that if the Department usually noted deliveries in a distinctive way, then it did so in this specific instance. But this is only a probability which, however great, cannot convict. Custom at best is a weak reed, but when revealed by the Government's agents as inconstant, it has a minim of probative force. While we are sensible to the difficulties of reconstructing one of myriad postal events, nevertheless when, as here, the prosecution makes it the vital nexus of the accused to the crime it assumes and must surmount this difficulty.

II. The third count avers use of the mail in the transmission of the Knight tract lien certificate from the Baltimore County Office of Finance to Ellicott. This document is simply a report of such public liens as are outstanding for side-

walks, sewers, curbs or gutters. It was ordered by the examiner who was searching the title for Ellicott's attorney. The abstractor applied for the report on the afternoon of December 5, 1961 with a request, by endorsement on the application of Ellicott's name and address, that it be sent to the latter.

The head of the lien department explained that unless an application was marked "hold or will pick up", he would send it by mail. When not so noted, he would place it in an addressed envelope and take it with others to the mail room of his office. He could not recall the particular occasion of its issuance, but he did identify as the Knight certificate the one shown him on the stand, recognizing it by the title searcher's handwriting. No memorandum of pick-up appeared on the application.

Considerable undisputed evidence revealed that frequently certificates were not mailed though not marked for pick-up. Ellicott's office was less than two city blocks from the lien department. He was in a hurry for the certificate; he wanted the land deal to be completed before the end of the dividend year. Ellicott and a companion testified that together they obtained the lien certificate at the lien office personally.

Pursuing the same process and principles of review as we applied in the Jones count, we can see no place in the evidence for a finding beyond a reasonable doubt of Ellicott's use of the mails. Disregarding the statements of his companion and himself, as the District Court rightfully did, only a practice or custom of mailing is left, proving nothing more than a probability, upon which a judgment beyond a reasonable doubt cannot rest. No one testified to an actual mailing.

The other assignments of error we find unsustained. We observe in passing that the use of the mails in this case was only slightly related to the fraudulent scheme. For reasons just given we are compelled to set aside the convictions of appellants Ellicott, Fleury and Jones, remanding the case to the District Court for a new trial if the Government is so advised.

Reversed and remanded.

HAYNSWORTH, Circuit Judge (dissenting).

The Court, it seems to me, applies an erroneous standard of review, though the words it employs are generally in keeping with the correct principles.

Proof of fraudulent transactions was clear and convincing, but the offenses proven are cognizable only in the state courts, unless the proof shows resort to the mails in furtherance of their accomplishment. It is with respect to the mailings as charged in the indictment that the Court finds the evidence insufficient to support the findings of the District Judge.

Evidence of the mailings, in each instance, was largely circumstantial, but that is not to disparage it, for circumstantial evidence is frequently much more reliable than direct testimonial versions of observations of a witness months or years before he is called upon to recall and recite them. Nevertheless, it was once widely thought that circumstantial evidence in a criminal case would be insufficient to support a judgment of conviction, unless it foreclosed every reasonable hypothesis consistent with innocence. Happily, that notion was laid to rest by the Supreme Court in 1954.[1] We, of course, follow the rules laid down by the Supreme Court in Holland and permit fact finders in criminal cases to draw such reasonable inferences as the circumstantial evidence may support, notwithstanding the fact that some other trier permissibly might draw a conflicting inference from the same evidence.[2]

1. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150.

2. See White v. United States, 4 Cir., 279 F.2d 740, 748; United States v. Lawrenson, 4 Cir., 298 F.2d 880; Milanovich v. United States, 4 Cir., 275 F.2d 716, rev'd on other grounds, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773.

This means, of course, that the jury may act upon the basis of reasonable probabilities arising from circumstantial evidence. To say that the evidence created only a probability of mailing, therefore, is not to answer the question.

Adverting briefly and illustratively to the act of mailing charged in the second count, the Government's evidence of the practice of time-date stamping material received by mail seems to me clearly, and alone unequivocally, to warrant a finding that the letter and the charter application were received by mail on the Monday morning following the Friday upon which the letter was dated. The underpinnings of the circumstantial proof of the mailing were attacked by the presentation of evidence of the test, in which a document was delivered by hand on a Friday, late in the afternoon, and was actually processed through the automatic time-date machine. It was done so promptly, however, and was properly stamped as having been received on that Friday afternoon. Evidence of this test indicates that the proven custom of using the electric machine only on matter received by mail was not invariable, but it neither shatters the Government's proof nor requires its rejection. It seems to me only to reduce the degree of the Government's proof from overwhelmingly compelling to permissive. Proof of this test, it should be noted, does not support the self-serving testimonial denials of Jones. It would have done so had the test paper been time-dated on the following Monday morning, but it was not. If meticulousness in a public office of that sort is required in connection with any aspect of its work, it is in respect to the proper notation of the date and time of the receipt of such documents.

Proof of the test, therefore, shows only, so far as appears on this record, one extraordinary departure from the practice shown by the Government's proof of the processing on the electric time-dating machine only of material received by mail. Occasional or infrequent departures from the proven practice do not destroy the value of the proof of the practice. Evidence of the test does not tend to prove in any way that the paper was received earlier than Monday morning, and, to that extent, cannot support the claim of Jones that it was delivered by hand on Friday.

Analysis of the evidence bearing upon the other mailing charged in the indictment leads me to a similar conclusion. That evidence created a factual issue which the trier-of-fact resolved. That was his province, not ours.

In a criminal case, a finding of guilt can rest only upon proof beyond a reasonable doubt. The rule, however, does not require the members of this Court to be convinced beyond a reasonable doubt of the guilt of the defendants. The judgment we exercise cannot be subjective. Whether or not we entertain doubts, grave or small, we are required to affirm if there is substantial evidence in the case which, if accepted by the fact finder, would justify a conclusion by a reasonable judge or jury that the defendant was guilty beyond a reasonable doubt. In approaching our task, moreover, we are required to largely disregard conflicting evidence, for, in appraising the sufficiency of proof to support the finding of guilt, we must look at it in the light most favorable to the finding and, therefore, to the Government.

These principles are well established.[3]

This case was tried to the Court without a jury. He was entitled to disbelieve Jones' self-serving testimony that he delivered the papers by hand rather than by mail. He was entitled to accept the Government's circumstantial evidence as establishing an invariable, or substantially invariable, practice of time-date stamping documents with an electric machine

3. Bell v. United States, 4 Cir., 185 F.2d 302. See also Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Stoppelli v. United States, 9 Cir., 183 F.2d 391; United States v. Brown, 2 Cir., 236 F.2d 403; Williams v. United States, 4 Cir., 271 F.2d 703; Crawley v. United States, 4 Cir., 268 F.2d 808; White v. United States, 4 Cir., 279 F.2d 740.

**874**

only when received by mail and the invariable practice of time-date stamping every document on the date upon which it was received. Thus viewed in the light most favorable to the Government, as we must now view the evidence, I think the proof quite sufficient to authorize this thoroughly reasonable Judge to conclude beyond a reasonable doubt that the mailing in fact occurred as charged.

The Court takes note of the principles governing our review, but, it seems to me, it departs from them in their application or it ignores the teaching of the Supreme Court in Holland, noted above, that a jury is entitled to convict on the basis of probabilities arising out of circumstantial evidence.

Because I think the findings of the District Judge should be accepted, I respectfully dissent.