**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Christopher Lyman MAGEE, Defendant-
Appellant.**

**No. 12360.**

United States Court of Appeals
Seventh Circuit.

Dec. 19, 1958.

Richard E. Gorman, Chicago, Ill., Floyd O. Jellison, South Bend, Ind., for appellant.

Hugh A. Henry, Jr., Asst. U. S. Atty., South Bend, Ind., Kenneth C. Raub, Asst. U. S. Atty., Hammond, Ind., Hugh A. Henry, Jr., Asst. U. S. Atty., South Bend, Ind., Martin H. Kinney, Asst. U. S. Atty., Hammond, Ind., for appellee.

Before SCHNACKENBERG, HASTINGS and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Charged by indictment with violations of 18 U.S.C.A. § 2113(a) and (d), defendant was found guilty by a jury, and was, by judgment of the district court, sentenced to imprisonment, from which judgment he has appealed.

The evidence showed that a man held up the National Bank and Trust Company of South Bend, Lincolnway West Branch (herein sometimes called the South Bend bank) on January 15, 1957. There is no contradiction of this fact nor as to the manner in which the holdup was perpetrated. Several witnesses for the government testified that they had seen the robber and that defendant was that person, although they admitted some inconsistencies between their testimony and the original description of the robber which they had given to the Federal Bureau of Investigation immediately after the commission of the crime.

At this point in the government's case, it produced Robert W. Havely and Carol Sullivan, who were permitted, over repeated objections by defense counsel, to testify to facts, which we now summarize.

Havely, office manager of the Reserve Savings and Loan Association, located in Cicero, Illinois, testified that on June 13, 1955, he talked with a man who said he was in a partnership involving a patent for a burglary alarm and that Havely's organization might be interested financially. As the man sat at Havely's desk he withdrew from his umbrella and raincoat a gun which he shoved in the direction of Havely. Havely suggested that they "go in the back room to sign some papers." Havely and the man proceeded into the back room, where the man got behind one of the cages and demanded that Havely hand him the money. Havely handed the man $1500 out of a drawer

and out of a safe an additional $1000. He then led the man down into the basement and the man "walked out of the bank."

Havely in the courtroom identified defendant as the man who robbed the Association on June 13, 1955.

Miss Sullivan testified that on August 13, *1956*, she was employed as a cashier for the same building and loan association in Cicero, Illinois. Two men walked into that establishment on that date. One of them, whom she identified as the defendant herein, pointed a gun at her. Her testimony proceeded as follows:

"A. He was leaning over the counter pointing the gun at us.

"Q. At whom? A. Well, Mrs. Foster was back with me at the time.

"Q. Was she there when these men walked in the door? A. No, she was sitting at her desk.

"Q. And when did she come around behind the counter at your cage? A. Well, just at the time they pointed the guns at us. She was instructed to come back behind the counter.

. "Q. Did either of these two men say anything to you, or say anything to this other teller, in your presence there at that time?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. The *defendant* told Mrs. Foster to get back. She was sitting at the desk and he told her to get back or they would blow her brains out. He directed both of us to get the money out of the safe, and Mrs. Foster said she don't know how, and I said I would, don't hurt us, and the men in the meantime, the tall, thin man, had come to where we were, and I stooped down at the safe and took the money out of the safe and handed it to him. The *defendant* said get the money out of the drawer and I gave the money out of the drawer and he said, there is another drawer, and in the meantime the first man was rifling the other drawer which had no money, and I

said here, the money is down to another drawer. And it was American Express money order drawers. (Italics supplied.)

"Q. Do you know how much money you gave to these men there at the time? A. Well, approximately about 4 or 5 hundred.

"Q. How do you know that? A. We took an audit."

Defendant's counsel moved for a mistrial, because of the irrelevancy of the testimony of Havely and Miss Sullivan. The motion was overruled.

The court gave the jury the following instruction:

"With relation to the testimony of Robert W. Havely and Miss Carol Sullivan, employees of a Savings and Loan Association of Cicero, Illinois, the Court instructs you that the use of their testimony should be confined entirely to the question of the identity of the defendant as it relates to the crime which is charged in the present Indictment.

"Even if you find that the defendant had committed any other crime or crimes and violations of the law, he is not on trial for those, but you may take the testimony of Mr. Havely and Miss Sullivan with what credibility *you* give him and her, and determine whether or not this testimony throws any light upon the question of identity of the defendant as charged in the Counts of the present Indictment, that is, the robbery of the Lincolnway West Branch of the National Bank and Trust Company of South Bend on January 15, 1957."

In its brief in this court, government counsel admit that if evidence of similar crimes by the defendant was erroneously admitted, the defendant is entitled to a new trial.

It is of some significance that the government's attempt to justify the court's admission of the evidence of the Cicero holdups is confined to only *slightly* more than two pages of its brief. In stating

its reason for introducing the evidence of Havely and Miss Sullivan, the government contents itself with this brief sentence:

"The testimony of Robert W. Havely and Carol Sullivan showed the *ease of identification* under circumstances similar to those surrounding the identification of the defendant by the Government witnesses. * * *" (Italics supplied.)

Government counsel cite no case to support this "ease of identification" test, which apparently originates with them.

It should be noted that neither of these witnesses was present on the occasion of the South Bend holdup, which took place about one year and eight months after the first Cicero holdup and about five months after the second Cicero holdup.

Upon oral argument, government counsel, in seeking to justify the admission of this evidence, asserted that they relied on the similar nature of the offenses, pointing out, first, that, while one victim was a building and loan association and the other was a bank, they were both in counsel's words, "financial institutions", and, second, the holdups were initiated by the robber's talking to an officer about some contemplated business transaction. However, as to the second holdup at Cicero, there was no conversation by either robber with anyone connected with the association in regard to any business transaction. Miss Sullivan testified that two men came in, talked to each other, pointed a gun at her and another employee, and took the money. In the South Bend holdup the robber had no companion.

It does not appear that anyone was arrested for, or convicted of, either of the Cicero crimes.

■ The general rule is that evidence that accused has committed another crime independent of, and unconnected with, the one on trial is inadmissible; it is not competent to prove one crime by proving another. 22 C.J.S. Criminal Law § 682, p. 1084. There are certain exceptions to the general rule, such as those recognized by us in several cases relied on by the government. However, those cases clearly fall within the exceptions, and this case at bar does not.

The established exceptions to the general rule are mentioned in United States v. Iacullo, 7 Cir., 226 F.2d 788, at page 793, where we held that evidence of another offense is admissible if it is so related to or connected with the crime charged as to establish a common scheme or purpose so associated that proof of one tends to prove the other, or if both are connected with a single purpose and in pursuance of a single object; as well as to establish identity, guilty knowledge, intent and motive. It appeared that the evidence in regard to the identity of Iacullo, a defendant in a federal narcotics prosecution, had definite probative value. It showed that on September 18, 1953, a fingerprint was found on a newspaper which was wrapped around an envelope containing heroin, but bearing no tax stamps. There was also evidence that, in a transaction on December 9, 1953, the outer wrapping of a package containing narcotics was a sheet of newspaper which contained two fingerprints. The evidence showed that all of these prints were identical with those of Iacullo which were taken by the government on March 16, 1954.

At page 795, we said:

"Circumstantial evidence tending to indicate that Iacullo handled the newspaper wrappings of the deliveries made pursuant to two of said sales was introduced in the form of testimony that his fingerprints appeared thereon.

\* \* \* \* \* \*

"* * * It became a question of fact for the district court to determine whether the direct evidence and the reasonable inferences to be drawn from the circumstantial evidence were to be accepted as guilt of Iacullo or his testimony to the contrary was to be accepted. * * * We cannot say that the court was in

error in coming to the conclusion that the evidence proved him guilty beyond a reasonable doubt. * * * "

Obviously there can be no more reliable evidence of the identity of a defendant than his own fingerprints. The fact that they were obtained in two separate transactions, which in themselves were violations of law on Iacullo's part, did not prevent their introduction into evidence, where the fact that they were his prints appeared from a comparison with a fingerprint impression proved to be his.

In United States v. Wall, 7 Cir., 225 F. 2d 905, at page 907, we pointed out that certain testimony was admissible to show that defendant, who was charged with promising to use his influence to procure promotions for postal employees, had an established plan of doing business in the selling of his influence for that purpose.

In United States v. Tandaric, 7 Cir., 152 F.2d 3, we recognized that evidence to prove the intent of a defendant is admissible even though it also shows the commission of another offense. Obviously there is no question in the case at bar as to the intent of the robber who held up the South Bend bank. Indeed, the government does not seek to justify the admission of evidence as to the two Cicero holdups as an attempt to show intent.

Our holding in United States v. Platt, 7 Cir., 156 F.2d 326, 327, does not justify the position of the government in this case. That case involved evidence of another offense offered to prove intent and scienter of defendant in the case on trial.

Harbold v. United States, 10 Cir., 255 F.2d 202, is a case where the evidence upon which reversal of a conviction was sought, did not show that another *offense* had been committed by the defendant. It is not in point here.

■ Finally, the government relies on Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077. However, a careful reading of the Boyd opinion confirms our belief that the judgment in this case must be reversed. In that case a conviction of Boyd and Standley, for the murder of one Dansby, was reversed and the case remanded for a new trial, because evidence as to robberies of Brinson, Mode and Hall committed by defendants two or three weeks before the killing of Dansby was inadmissible for the purpose of identifying defendants or for any other purpose whatsoever. The court said, 142 U.S. at page 458, 12 S.Ct. at page 295:

" * * * the injury done the defendants in that regard was not cured by anything contained in the charge. Whether Standley robbed Brinson and Mode, and whether he and Boyd robbed Hall, were matters wholly apart from the inquiry as to the murder of Dansby. They were collateral to the issue to be tried. * * * They afforded no legal presumption or inference as to the particular crime charged. Those robberies may have been committed by the defendants in March, and yet they may have been innocent of the murder of Dansby in April. Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death. Upon a careful scrutiny of the record we are constrained to hold that, in at least the particulars to which we have adverted, those rules were not observed at the trial below. * * * "

We are convinced that the crimes committed in Illinois had no connection with the South Bend holdup and that evidence of the former was improperly (and, incidentally, needlessly,) admitted by the district court. The error was not cured by the court's instruction as to this evidence. As Mr. Justice Jackson said in Krulewitch v. United States, 336 U.S. 440, at page 453, 69 S.Ct. 716, 93 L.Ed. 790, the naive assumption that prejudi-

cial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction.

For the reasons herein set forth, the judgment of the district court is reversed and this cause is remanded to that court for a new trial.

Reversed and remanded.