**Robert Joyner WHITE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 8010.**

United States Court of Appeals
Fourth Circuit.

Argued March 15, 1960.

Decided June 18, 1960.

742

Ivy P. Blue, Jr., Richmond, Va. (Blue & Wyatt, Richmond, Va., on brief), for appellant.

Henry St. J. FitzGerald, Asst. U. S. Atty., Alexandria, Va. (Joseph S. Bambacus, U. S. Atty, Richmond, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

Robert Joyner White, hereinafter sometimes referred to as "White" or "defendant", was indicted for armed robbery, was tried, convicted and sentenced to a prison term of fifteen years. Motions for mistrial, for judgment of acquittal, to set aside the verdict and to grant a new trial were denied.

■ On this appeal the defendant has indulged in innumerable assignments of error and, after full consideration of this barrage, the task of determining those assignments which merit discussion is quite difficult. We venture the suggestion that it is often more effective to concentrate the attack on the more important asserted errors and abandon those which are easily recognized as frivolous. Broadly, the defendant charges that the evidence was insufficient to sustain a conviction, that improper evidence was admitted, that the court erred in denying motions for mistrial and judgment of acquittal and that the defendant was not accorded a "fair trial."

■ Certain evidence offered by the prosecution was first admitted over objection, or was conditionally admitted upon the representation of Government counsel that it would be connected up, but was later determined by the court to be improper and the jury was instructed to disregard it. We first examine the evidence which was permitted to remain in the case for jury consideration.

There was testimony to the effect that shortly before nine o'clock on the morning of April 28, 1959, a masked bandit appeared in the Lakeside Branch of the First Federal Savings and Loan Association of Richmond, Virginia, and, at gun point, robbed the two bank employees of $3,125. The employees, Miss Dortch and Mr. Gilchrist, could furnish no positive identification of the robber. They described him as of medium size, wearing blue suede, rubber-soled shoes and a red and blue or red and black striped shirt, his face being completely covered with a plastic or rubber mask. Both employees were in the banking room when the robber, who obviously came from a furnace and janitor's room immediately adjacent to the banking room, suddenly appeared. He held a gun in his hand and ordered Miss Dortch to put the bank's money in a shopping bag which he carried. After obeying this direction and the further direction that both employees crawl into the adjoining janitor's or furnace room, the robber wedged the door of that room tightly closed by the use of a screw driver, cautioning the employees against attempting to give an immediate alarm. He made good his escape.

On the afternoon of the same day, White, a widower, was found at the home where his two elderly aunts and one of his children resided, was taken into cus-

tody and questioned by agents of the Federal Bureau of Investigation but was released. Two days later, White was arrested in his own apartment and certain items of clothing and personal belongings, some of which were introduced into evidence at the trial, were voluntarily given to the arresting officers for examination. The money, gloves and the mask worn by the robber were never found.

The Government presented evidence to prove a theoretical reconstruction of the crime. It was the prosecution theory that the lone bandit broke into the bank building on the night of April 27, or in the early morning of April 28, and hid in the furnace room until the bank employees arrived at approximately 8:30 on the morning of April 28; that after robbing the bank the bandit supposedly used a stolen car or stolen cars to escape. To corroborate extrajudicial statements said to have been made by White, the Government offered evidence of a series of circumstances, clothing and personal belongings of the defendant and eye witness testimony.

Following his arrest, the defendant was placed in the Richmond City jail and one Clarence B. Snead, Jr., was there confined at the same time. Snead testified that he had known White since 1942 or 1943 and that while they were in jail, White told him in substance as follows: That, for about six months, he had been "casing" the bank which was robbed; that he had broken into the bank and perpetrated the robbery; that he had one stolen automobile parked in front of the bank and one "up from the bank"; that he had stolen the automobiles for that purpose—"to use them to get away when he went out of the bank to get to his car where he had parked it"; that he had a gun, an army .45 automatic, a pair of lady's gloves and a Halloween mask; that he entered the bank building about three o'clock in the morning and waited "in the boiler room or janitor's room" for the bank to open; that he knocked out the light bulb in the janitor's room with a broom handle so he would not be detected if someone attempted to turn on the light; that after the robbery he put the employees in the janitor's room, wedging a "screw driver or something in the door to keep them from getting out"; that he had obtained three thousand and some odd dollars in the robbery. This witness testified to a further conversation in which White suggested that if Snead should be released, White would tell him where the money was located so that the witness could obtain a bondsman for White. However, Snead was removed from the jail to another place of detention before the conversation was completed. It was shown by the testimony of other witnesses that the light bulb in the janitor's room *was, in fact, broken,* and this circumstance was not at any time mentioned in newspaper accounts of the robbery.

Morris J. Lapides testified that he had known White for several months and that in the month of February 1959 he was in White's apartment; that White showed him two rubber Halloween masks, one having a grayish pallor representing an old man, and one with yellow and green coloring representing a clown; that the masks were of the type which "fit completely over your head"; that White exhibited to him three guns, "two .45 caliber automatics and a .38" and "a pair of black woman's kid gloves that had been cut off to make them short." This witness further testified that on the day following the robbery, he met White at the Bell Tower Restaurant on North Third Street in Richmond about three o'clock in the afternoon and that White was reading from a copy of a Richmond newspaper which contained an account of the bank robbery.[1]

1. "A. * * * So then he [White] started going through the numerous accounts of robbery on Lakeside Avenue picking out the discrepancies in the newspaper story. The first thing that was said was that the bank employees didn't get any money for themselves because it was correct to the pennies.

* * * * * * *

"A. Then he began going on through the newspaper account and he told me

Another witness, Thomas Davis Rouse, was confined with White in the Richmond City jail. Rouse testified that in the month of May 1959, he had a conversation with White concerning the bank robbery and portions of the testimony of this witness are reproduced.[2]

One Severino who had been confined in jail with White testified that after he had refused to join White in a proposed jail

that he had gotten into the back of the bank and waited in the boiler room until the bank had opened and made himself at home by—excuse me—chinning himself and drinking a Coca-Cola and washing his hands; and when he mentioned chinning on the boiler pipes, I asked him, 'weren't they hot?' Then I thought of it myself and I said, 'No, I guess they turn them off overnight.' Then he told me it was not a boiler as you usually think of one, but a combination heating plant and air conditioning, a very modern type unit.

"Then he went on to the clothing that the robber had worn. In the newspaper it said that the robber had worn a button-down Ivy League type sports hat when in reality he had worn a pork pie hat, the one that he had on at the time.

\* \* \* \* \* \* \*

"A. Then, he mentioned the shirt that the newspaper account said was red and white and he couldn't understand how they made that mistake when in reality it was red and black, still vertical striped shirt.

"He mentioned the trousers that he had on, which were similar to the ones that he was wearing at the time of this conversation, and he mentioned the shoes, also a jacket was mentioned in the newspaper, and he told me that he didn't even own a blue suede jacket.

"About midway through this conversation, I said to him, 'Then it was you.' And he says, 'You damned right it was', and he said, 'I did it alone'.

\* \* \* \* \* \* \*

"Q. Did he tell you anything that he might have had with him when he went into the bank? A. Yes, he had a gun, the gun with him, the .45 calibre automatic, and some tape and his mask. He put his gloves on about ten blocks before he got to the bank and didn't take the gloves off until ten blocks away from the bank so there would be no fingerprints.

"Q. Did he tell you how he carried the money away from the bank? A. He had a paper bag. Miller & Rhoads shopping bag.

"Q. Did he tell you what if anything he did with Mr. Gilchrist and Miss Dortch? A. Yes, he locked them in the boiler room.

\* \* \* \* \* \* \*

"Q. Did he tell you anything concerning these shoes that he was wearing at the time of the robbery? Did he describe their color for you? A. They were grey buck chucker boots.

"Q. Did he make any comment to you concerning the shoes that were reported in the newspaper? A. Yes, he did, but I do not now recall the exact comment. But the shoes were mentioned.

\* \* \* \* \* \* \*

"Q. Did he tell you what he might have done or what he had done with the money that was taken from the bank? A. I asked him and he said it was in a safe place, but that was something that he wouldn't tell me.

"Q. Did the defendant say anything to you concerning the FBI agents who came to his room? A. Yes, he said that they had picked him up for questioning, but that they had released him because there were only four ways that you could convict a man and that was by fingerprints, by positive physical identification, being caught with the loot, or being caught at the scene.

\* \* \* \* \* \* \*

"Q. Did the defendant tell you how he made good his escape from this thing? A. I asked him if he just walked away and he said no, he had a car across the street. He didn't say which street or which way.

"Q. Did he tell you how many cars he might have used in making good his escape? A. He indicated that they were stolen cars and that it was only two and a half minutes to the first change point."

2. "A. He told me that he went out to the bank on Lakeside Avenue one night, about four o'clock in the morning, and him and a friend set in front of the bank and took a drink. Then he went around to the back of the bank, taped the window and broke it, unlocked the window. Then he came back and sent his friend home. Then he said he went back and went in the bank and went in the boiler room and stayed until a few minutes before nine and he crawled out of the boiler room, around behind the counter where it was a man and lady behind the counter, held a gun on the guy and made the girl fill the bag with money.

"Q. Did he tell you how he got away

break, White said: "Well, don't try to stop me because I would just as soon kill you as kill them. * * * You know a guy that's got nerve enough to rob a bank by himself has got nerve enough to hold a pistol on somebody to make a break for his freedom."

FBI Special Agent Barritt testified that early in the afternoon of April 30, two days following the bank robbery, he and another agent, Roche, went to White's apartment; that White opened the door and was informed that they had a warrant for his arrest. When asked if they had any conversation with White, Barritt answered: "Yes. When we entered, Mr. White asked, 'What mistakes have I made?' after we had informed him that he was under arrest for this robbery. I asked Mr. White what mistakes did he think we had found? He said that he didn't know, that he knew he had made some mistakes, but he wondered which ones we had been able to find. He said that he expected this and that he should have left town."

Agent Barritt then identified certain articles which were found in White's apartment and which were admitted in evidence. These included a .45 caliber automatic, a pair of dark suede shoes with a "ripple type sole" and a striped sport shirt. He testified that there were several other pistols and sport shirts found in the apartment. The shoes, when first produced, were described by the witness as "dark blue or Navy blue suede shoes", but on cross-examination, after describing them as "Navy blue or black", agent Barritt said: "I suppose they would be black, charcoal gray, maybe would be the best description." Counsel for White then asked, "And you agree that they are black?" and the witness answered, "Yes, sir."

The soles of these shoes bore a very distinctive design. The evidence disclosed that there was a modern combination heating and airconditioning unit in the furnace room in the bank, and on top of the unit and a water heater, in accumulated dust, the investigating officers discovered impressions obviously made by shoe soles. By a procedure, which was fully explained, these impressions were lifted and preserved by the use of a specially designed tape, photographed and compared with the design in the soles of White's suede shoes. It was testified that the prints found on the unit in the bank were made by shoes having the same distinctive design, although no witness could testify that the prints were actually made by White's shoes.

Defense counsel emphasized that the shoes worn by the robber were described by the bank employees as "blue suede". It was argued that the shoes introduced in evidence were black and could not, then, have been those worn by the robber. However, the shoes were in evidence for the court and jury to see and examine. It appears that they were dark in color and substantially the same type or style described by the bank employees. Even Agent Barritt was obviously uncertain as to color since he described them as "dark blue", "Navy blue," "charcoal grey" or "black". It was readily apparent that the edges of the soles were somewhat darker than the upper portion of the shoes. Witness Lapides testified (note 1) that White said he was wearing "grey buck chucker boots" at the time of the robbery.

In the investigation, but not immediately following the robbery, two partially smoked cigarettes were discovered in the furnace room behind the heating and cooling unit. They were the same brand smoked by White. None of the bank employees smoked cigarettes, according to the testimony.

from the bank? A. Yes, sir, he told me he left in a car. He told me he had two cars, one—

"Q. Did he tell you where he had gotten them? A. He said one was his own and he had stolen one.

"Q. Did he tell you what he used the cars for or how he used them? A. He said he had one car parked across the street and one at the bank."

M. W. Johnson, of the Richmond Police Department, testified that several days prior to the robbery White had reported to him that his .45 caliber automatic, Model 1911, Serial Number 922535, had been stolen. This is the same gun which was found, loaded, in White's own room at the time of his arrest. As to these facts there was no adequate explanation and it was the prosecution theory that the jury would be warranted in drawing an inference that White's false report of a missing gun was to provide a defense in the event that this same gun should be used as evidence against him in a criminal investigation or trial. In his statements to witnesses, White was said to have described the gun which he used in the robbery as a .45 caliber automatic.

There was undisputed testimony to show that White owned a 1959 model, new, black two-door Ford automobile which was equipped with very unusual and distinctive hub caps. One witness, who lives approximately one mile from the scene of the robbery, testified that she observed a car, exactly fitting that description, parked across the street in front of her home at six thirty on the morning of the robbery. She noted particularly the hub caps. Another witness, a lady who works in that vicinity, testified that she observed a car of that description parked at the same location a little before or a little after nine o'clock on that same morning; that a man with his hat pulled down over his face, who appeared nervous and "looked like he didn't know whether he wanted to go forward or go backwards," was standing in the street but suddenly "he had whirled down that street and jumped in that car and went off in a whiz"; that this man was carrying a shopping bag and was "kind of" small. The witness further stated that the man looked so frightful that she was scared and excited and she was unable to accurately describe him, his hat, clothes or the shopping bag. She did say, however, that he was "five or six" feet tall and looked "like he might have weighed 150 or 160 pounds, some-

thing like that." Defense counsel argued that this description would not fit White but a much larger man. The bank employees described the robber as of medium size.

As stated earlier, officers went to the residence of Miss Lelia White, defendant's aunt, in the afternoon of April 28, where they found the defendant undressed and in bed. Upon questioning, he was unable to give any satisfactory account of his activities the night before. He stated that he had gone to several "spots" which he normally visited; he was drinking whiskey and had no recollection of whom he had seen or where he had gone; he had arrived at his aunt's home at sometime between midnight and dawn, and went to a back hall room where he lay down. Then he changed his story and said that he had gone to the living room which is at the *front* of the upper half of a two-family dwelling; that another aunt, Mrs. Clark, who resides there, departed for work between eight and eight-thirty and he then went to her bedroom and retired; that Miss White knocked on the door sometime between eight-thirty and nine, but he indicated he did not want any breakfast and she did not enter; that he did not see Mrs. Clark when she left. He identified a 1959 two-door, black Ford automobile, with the distinctive hub caps, parked directly across the street, as his own.

The officers found, under the bed occupied by White, a pair of shoes, dark in color, having rubber or composition soles "with a pattern of some sort on the sole." They found also a pair of charcoal grey trousers and a "striped dark blue or black striped and red vertical striped shirt with a buttoned-down collar." After an attorney arrived in response to a call from White, they conferred and then accompanied the officers to the downtown office of the FBI where the interrogation of White was resumed. White then stated that he had gone to the home of one McCart on the previous evening about eight o'clock and he and McCart then "hit various spots"; that McCart was quite intoxicated and after

taking him home between two and four in the morning White went to his aunt's residence. After consultation with his attorney White declined an invitation to appear in a lineup before the robbed bank employees.

■■ The defendant has attacked the testimony of Lapides, Rouse, Severino and Snead, arguing that the testimony of these witnesses cannot be accepted as full proof of extrajudicial statements of the defendant. He urges that "the words of grudge bearers, felons, army deserters, liars and false martyrs for the cause of justice cannot be accepted without doubt by reasonable men." But we need cite no authority to support the age-old proposition that it is for the jury, not the court, to pass upon and determine the credibility of the witnesses and attach to their testimony the weight to which it is entitled under all the circumstances appearing from the evidence.

It was held in Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101, that an accused's extrajudicial admissions of essential facts or elements of the crime, made subsequent to the crime, are of the same character as confessions and corroboration by independent evidence is required. At page 93 of 348 U.S., at page 164 of 75 S.Ct., the court said:

"It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. * * It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt."

See also Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192. So it was for the jury to decide, with full knowledge of the circumstances and with this background information as to the character of these witnesses, whether to accept or reject their testimony. If the jury believed them, it then had before it the extrajudicial statements and all the corroborative evidence introduced by the prosecution, namely, the shoe sole impression, the cigarette butts, defendant's knowledge of the broken electric light bulb and of the combination heating and airconditioning unit, the general description of the robber and his clothing furnished by the bank employees and the new Ford automobile with the distinctive hub caps.

■ The defendant did not testify at his trial but testimony was offered in an attempt to establish an alibi and to show that he could not have perpetrated the robbery because, at the time it was committed, he was in the home of his two aunts, Miss White and Mrs. Clark. In his statements to the investigating and arresting officers, White claimed that on the night preceding the robbery, sometime between midnight and dawn, he went to the home of his aunts and went to sleep. As he retold his story, his statements were vacillating, inconsistent and contradictory. It is clear, however, that he was then attempting to lay the foundation for an alibi. The testimony of the aunts was offered to sustain this theory of defense. But the prosecution was able to point out that, in her testimony, Miss White claimed that she saw the defendant in her home on the morning of the robbery, while in her previous statements to the officers she claims only to have heard him. Mrs. Clark's testimony was not particularly enlightening. It was shown that White was orphaned at an early age and was reared by these aunts. When his wife died, some several months prior to these occurrences, one of White's young daughters was taken into the aunts' home and was there being cared for, particularly by Miss White. Thus

the extremely close personal relationship between and among the defendant, these witnesses and other members of his family was apparent. In receiving, evaluating the testimony of these witnesses, and applying credibility tests, the jury had the right to consider, among other things, their love for the defendant, their intense interest in the outcome of the trial and all the attendant circumstances.

■ The evidence offered by the prosecution was circumstantial but circumstantial evidence may support a verdict of guilty, though it does not exclude every reasonable hypothesis consistent with innocence. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. Upon consideration of the motion for judgment of acquittal, the evidence is to be viewed in the light most favorable to the prosecution and, in appraising its sufficiency, it is not necessary that the trial court or this court be convinced beyond a reasonable doubt of the guilt of the defendant. The question is whether there is substantial evidence upon which a *jury* might justifiably find the defendant guilty beyond a reasonable doubt. Bell v. United States, 4 Cir., 1950, 185 F.2d 302. See also Glasser v. United States, 1942, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680; Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391; United States v. Brown, 2 Cir., 1956, 236 F.2d 403; Williams v. United States, 4 Cir., 1959, 271 F.2d 703. As this court, speaking through Judge Haynsworth in Crawley v. United States, 4 Cir., 1959, 268 F. 2d 808, 811, said:

> "On the motion to acquit, the District Judge, as we must, looked at all of the circumstances, which collectively create much more than a speculative possibility of guilt. In their sum, they raise a strong probability of guilt which only the most incredulous would fail to recognize. It is the sort ‧of reasonable probability which the jury must weigh and upon the basis of which juries routinely act."

We perceive no error in the denial of the motion for judgment of acquittal.

### Consideration of Excluded Evidence

Ronald Gene Cohen, a medical student, testified that he had known White for several months prior to the Lakeside bank robbery; that on two different occasions early in the year 1958, White told him that "he had plans to rob a bank or a large payroll"; that White showed him guns, a mask, and a pair of gloves, all in White's apartment.

Witness Lapides, in addition to testimony noted earlier, testified that in February 1958, White had told him he had a plan to make a lot of money and that his plan was to rob a bank; that the bank then in contemplation was a bank on the Petersburg Pike and getaway cars would be stolen the night before; that Lapides refused White's invitation to participate; that after the Lakeside robbery, White said he had done that job alone to make it worthwhile and that this decision was reached after Lapides had previously turned him down.

■ There was no evidence that any bank on the Petersburg Pike had been robbed. White had plans, according to the testimony, to rob *a* bank or *a* payroll and then, pursuant to such plan, selected the bank on the Petersburg Pike as his victim but apparently Lapides' refusal to participate caused him to alter that plan. Evidence of possession of guns, masks and gloves, articles very appropriate and useful in executing such plan, was offered and admitted. If a bank on the Petersburg Pike had actually been robbed and the defendant were shown to have perpetrated that robbery, such evidence would have been subject to the objection that proof of the commission of a prior similar offense is not competent evidence of guilt in the case at bar. See United States v. Magee, 7 Cir., 1958, 261 F.2d 609.

■ But here we have testimony as to a continuing broad and general plan, first, to rob a bank (apparently any bank) or a payroll; then, disclosure to a possible accomplice of the plan to rob a bank on the Petersburg Pike, which plan was abandoned; then the execution of the broad

plan culminating in the robbery of the Lakeside bank. Standing alone and without more, the mere formulation of a plan to obtain money by robbery is not illegal. But, after the plan has been executed and there is evidence that the defendant has committed the crime, evidence of a prior declaration by the defendant of a plan and intent to obtain money by robbery is not inadmissible. The trial judge, in his charge, excluded all the evidence as to White's announced plans for bank robbery and directed that it be disregarded by the jury. Concluding, as we do, that this evidence was properly admissible under the circumstances and the trial court was not bound to exclude it from jury consideration, the defendant has no cause to complain.

In the course of Government counsel's direct examination witness Snead was asked how long he had known White. He replied that he had known him very well since 1942 or 1943 and that he had "served time with him in the Training School for Boys." Defense counsel immediately moved for a mistrial. There was no evidence to indicate knowledge of Government counsel that White and Snead, as boys, had been in a Training School. In fact, the United State Attorney expressed complete surprise. The court denied the motion for mistrial and immediately instructed the jury to ignore Snead's comment tending to show White's early background.

Ordinarily, the granting or refusing of a motion for mistrial is in the sound discretion of the trial judge,[3] and we find no abuse of such discretion in this instance. Here there was evidence that White had been married, was a widower with two children, and that his aunts by whom he had been reared were respectable persons. Any reference to a training school for boys must have related to a much earlier period of the defendant's life. Obviously, the question asked Snead was not calculated to elicit such an unexpected response, and the trial judge could well have concluded that such reference to a boys' training school by this witness would be a matter of small moment to the jury in view of the seriousness of the offense charged and the trial as a whole.

It was the Government's theory, based upon White's statements and admissions, that he had used a stolen (perhaps two stolen cars) and his own car in making his getaway following the robbery. Mrs. Ada Pfeffer owned a 1958 black and white Ford which had been stolen in March 1958 and recovered after it had been abandoned in Charlotte, North Carolina. Witness Cohen testified that White had told him of stealing the car, operating it by "jumping" the wires, later having a key made and abandoning the car in Charlotte after attempting to sell it in Atlanta, Georgia. This car was again stolen on the night of April 27, 1959, and, following the robbery, was discovered parked at Howard Johnson's Restaurant in the vicinity of the bank. The Government's theory is shown in the statement of the United States Attorney to the court and in the presence of the jury, which follows: "It is relevant for this reason, Your Honor. The defendant made several admissions, according to the evidence, that he had planned to use stolen automobiles as getaway cars. The defendant stole this automobile, the evidence indicates, in March; he had a key made for it; the automobile was found in the vicinity of the bank." This explanation was prompted by the challenge of defense counsel to the Government to show relevancy.

A motion for mistrial, based upon this evidence concerning the Pfeffer automobile, was denied, but the jury was instructed to disregard the testimony since the Government had failed to show any connection between the stolen Pfeffer car

**3.** Hagans v. United States, 5 Cir., 1948, 170 F.2d 141; Reistroffer v. United States, 8 Cir., 1958, 258 F.2d 379, 392, 393; United States v. Giallo, 2 Cir., 1953, 206 F.2d 207; Heflin v. United States, 5 Cir., 1955, 223 F.2d 371; United States v. Simone, 2 Cir., 1953, 205 F.2d 480; Hilliard v. United States, 4 Cir., 1941, 121 F.2d 992, 998.

and the robbery. We find no error in these rulings of the trial court. The jury had before it the statements and admissions of White that he *had* used stolen cars in leaving the scene of the robbery and the judge was warranted in concluding that the testimony as to the stolen Pfeffer car was not so prejudicial as to require the granting of a mistrial.

## Other Alleged Errors

Defendant charges that the United States Attorney, in his argument to the jury, misstated the evidence and improperly commented on the possible future effect of an unwarranted acquittal. On this record these charges are without merit.

Defendant urges that the court erred in its charge to the jury and in refusing to give certain instructions requested by the defendant. We have carefully examined and considered the instructions given as well as those refused, and we are convinced that there was no error in these particulars. The jury was fully instructed as to the law of the case and the issues were properly, fairly and clearly presented.

▆ Defendant further complains, the jury having failed to arrive at a verdict after a period of deliberation, that the judge gave the so-called "Allen" charge and, after a further period of deliberation, at the specific request of the jury, the "Allen" charge was again given. This court has repeatedly approved the instruction substantially in the form in which it was here given. It conveyed to the jurors the importance of deciding the case, if they could conscientiously do so, without placing any undue pressure on any portion or number of the jurors to change their views. For our early decision, see Johnson v. United States, 4 Cir., 1925, 5 F.2d 471, and for a later full discussion see Orton v. United States, 4 Cir., 1955, 221 F.2d 632, 634–636, certiorari denied 1955, 350 U.S. 821, 76 S. Ct. 47, 100 L.Ed. 734. Repeating, for the benefit of the jury and *at its request,* a properly framed instruction would not constitute reversible error.

It is further asserted that the court erred in denying the defendant's motion to set aside the jury's verdict as contrary to the law and the evidence and his motion for a new trial because of after-discovered evidence. We have carefully considered these contentions and the arguments presented in support thereof. Perceiving no error in the rulings of the court and no abuse of discretion, we decline to uselessly extend this discussion.

> "On a motion to set aside a verdict and grant a new trial on the ground that it is contrary to the evidence, the trial court is invested with a wide discretion, and his action thereon will not be disturbed in the absence of a showing of an abuse of discretion."

Johnson v. United States, 4 Cir., 1959, 265 F.2d 496, 497. See Middleton v. United States, 4 Cir., 1957, 249 F.2d 719, 720; Hawkins, Inc. v. United States, 4 Cir., 1957, 244 F.2d 854, 856; Boyd v. United States, 4 Cir., 1955, 226 F.2d 222.

Affirmed.