**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles HOFFMAN, Jr., Defendant-
Appellant.**

**No. 16410.**

United States Court of Appeals
Seventh Circuit.

July 18, 1969.

Rehearing Denied Aug. 13, 1969.

Certiorari Denied Dec. 8, 1969.
See 90 S.Ct. 431.

Thomas P. Sullivan, Hugh M. King, Chicago, Ill., for defendant-appellant Charles Hoffman, Jr.; Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel.

Thomas A. Foran, U. S. Atty., Richard G. Schultz, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee. Michael B. Nash, Michael B. Cohen, Asst. U. S. Attys., of counsel.

Before CASTLE, Chief Judge, KNOCH, Senior Circuit Judge, and KERNER, Circuit Judge.

KERNER, Circuit Judge.

Charles Hoffman, Jr. (defendant-appellant) was indicted on five counts for violations of Title 18 U.S.C. §§ 1343 (Count 1), 1341 (Count 2), 1341 and 43 (Count 3), 371 (Count 4) and 2314 (Count 5) (federal mail and wire fraud, conspiracy, and interstate transportation of funds obtained by fraud). The jury returned a verdict of guilty on Counts 1, 2 and 4 and judgment was entered by the Court committing the defendant to a term of ten (10) years and a fine of Ten Thousand ($10,000) Dollars on Count 4, and probation for a period of five (5) years after release from incarceration on Counts 1 and 2, conditioning the probation with the following: "[i]n addition defendant is required to make restitution in an amount agreed upon or ascertained by the Director of Insurance of the State of Illinois."

The transactions presented by the Government are intricate and complicated, involving defendant Charles Hoffman, and defendant Rufus R. McLarty. McLarty was discharged from prosecution before the conclusion of the trial, and Hoffman's motion for judgment of acquittal as to Count 3 (conspiracy) was granted.

This case involves the sale and manipulation of various insurance companies and agencies and their assets. The indictment alleges the criminal acts began "on or about December 1, 1963." Hoffman testified on direct examination that "in late 1960" he purchased all of the stock of RCD Insurance Agency (RCD Agency). In 1960 Multi-State Inter-Insurance Exchange (Multi-State) was an existing insurance reciprocal association (previously known as Rural Inter-Insurance Exchange), an aggregation of people who exchange contracts of insurance. A reciprocal is not a corporation, but is an association of individual underwriters, and each underwriter is liable for his share of any losses. The reciprocal is the property of the policyholders and, in this respect, is comparable to a mutual company.

RCD Management Inc. (RCD Management) was the attorney-in-fact for, and general manager of, Multi-State and its sales agency, RCD Agency. Multi-State sold only high-risk automobile policies through RCD Agency for which sales, RCD Agency was to receive a commission. RCD Management, for its services as attorney-in-fact was to receive a 12% commission on premiums of all policies written by Multi-State and to be paid by Multi-State to RCD Management.

The Illinois Insurance Code requires all insurance writers to maintain a minimum surplus to cover unexpected contingencies. Failure to maintain this surplus requires notice to the Insurance Department and, should the assets be impaired, no new policies may be written. In the summer of 1963, the Illinois Department of Insurance commenced an examination of Multi-State, whose books reflected a failure to pay RCD Management the attorney-in-fact fees and the amount owed was not entered as a liability. The unpaid commissions totaled approximately $200,000, which liability impaired the reciprocal's surplus. Hoffman, the owner of all of the stock of RCD Management, stated he would waive all fees and commissions and an

affidavit of waiver was filed on July 16, 1963; thereafter Multi-State was allowed to continue in business.

The Department of Insurance continued the examination of Multi-State. Listed as an asset were $50,000 in bonds issued by Griffin Finance, an unidentifiable entity. Hoffman and Vaughn Woodruff, his attorney, were informed by the Department that a cease and desist order would be issued against Multi-State because of impaired assets.

On November 29, 1963, the Department filed a complaint against Multi-State seeking to enjoin it from doing any business, and alleging violation of the Insurance Code. On December 6, 1963, the Circuit Court of Cook County ordered the books and property seized by the Insurance Department returned and entered an order allowing Multi-State to continue business if it would comply with certain conditions:

1. Cease and desist writing policies of insurance.
2. Cancel all outstanding insurance policies within a reasonable time.
3. Expeditiously dispose of all claims.
4. Prior to resuming the writing of new policies, notify the Director of Insurance of that intention and file a statement of condition which will be examined.

No other order was entered in the Circuit Court until an order of liquidation entered September 11, 1964.

Late in 1963, Hoffman began negotiations with McLarty for the sale of RCD Management and RCD Agency for the sum of $333,333, culminating in the transfer of ownership on February 4, 1964, and with it the resultant control of Multi-State. The sale was closed at a bank located in Reynolds, Georgia. Simultaneously, McLarty, on the representation of Hoffman that Multi-State was solvent, ordered a check drawn in the sum of $335,000 from the account of Multi-State payable to RCD Agency. RCD Agency, on McLarty's order, drew a check for $333,333 to Hoffman for the purchase price. The credit transactions were handled by wire and mails.

During the month of January, 1964, Hoffman withdrew monies of Multi-State from various banks in Chicago which were deposited to his personal accounts in the First National Bank of Evanston, or transferred them to a new Multi-State account newly opened in Kingland, Georgia. The dates and amounts are not controverted.

Evidence of additional inter-corporate activities and exchanges of assets and stocks were introduced into evidence covering a period prior to December 1, 1963, and extending into July, 1964. Some of these transactions relate to Multi-State, others to entities controlled by Hoffman.

On November 1, 1963, Hoffman presented to George Bloss, president and director of RCD Management, prepared minutes of a Board of Directors meeting of RCD Management. The minutes stated that the Directors had voted that RCD Management would sell its law library and two Chevrolet automobiles to So-Jess Management, Inc. (So-Jess) (an Illinois corporation owned by Hoffman which handled claims for Multi-State and Progressive General Agency), in exchange for office space and services to be rendered by So-Jess in the future. Bloss signed the minutes, though he testified no such directors meeting took place and no services were rendered to RCD Management by So-Jess. The value assigned to the library was $1,300 and $1,050 as the value of the automobiles subject to mortgages, though the mortgage payments were made by Multi-State in November and December, 1963, and January, 1964.

Early in 1963, Hoffman purchased the building at 180 W. Randolph, Chicago. The following were moved into the building: Multi-State, RCD Management, RCD Agency, So-Jess Insurors Holding Corporation (an Illinois corporation, owned by Hoffman and his wife, which held stock in various entities involved), Progressive General Insurance Company (PGI) (an Illinois stock in-

surance company controlled and owned by Insurors Holding Corporation), and Progressive General Agency (PGA) (an Illinois corporation owned by Hoffman which was sales agent for PGI). Hoffman remodeled the building, improvements being paid for by PGA and RCD Management in the total sum of $39,763.-32.

In September, 1963, RCD Management, on behalf of Multi-State, resolved to purchase these leasehold improvements for $83,000. Bloss, who signed the minutes at Hoffman's request, testified he did not vote on the resolution. The improvements were paid for by the transfer of Multi-State funds: $43,000 to PGA and $40,000 to RCD Agency.

A resolution of RCD Management on behalf of Multi-State, dated November 25, 1963, assigned the Multi-State leasehold at 180 W. Randolph to PGI immediately. Bloss, who signed the minutes, again testified he did so at Hoffman's direction, although no meeting took place. Prior to November 25 and until January 29, 1964, Multi-State made payments for improvements of the leasehold, which inured to the benefit of PGI in the sum of $116,154. This sum invested by Multi-State in the leaseholds was abandoned to PGI when Multi-State was removed from the premises as agreed in the contract of sale to McLarty, though McLarty had not been informed of the improvements paid for by Multi-State.

On December 30, 1963, RCD Agency loaned $20,500 to PGA. On the following day, an additional $69,250 was loaned to PGA. This sum of $89,750 belonged to Multi-State, and was offset under a contract between RCD Agency and PGA whereby four percent of RCD Agency's gross sales premiums would be paid to PGA for management and services. A computation of this contract of January 2, 1963, indicated a sum of $87,013.28 due, which was to be computed monthly, but had not been entered on the books of RCD Agency until December 31, 1963, and did not appear on the books of PGA until June 30, 1964.

Bloss testified he knew of no services performed by PGA for RCD Agency during 1963.

The $87,013.28 owed by RCD Agency to PGA was offset by the $89,750 RCD Agency loaned to PGA, leaving a balance of about $2,500. After February 4, 1964, when McLarty owned the stock of RCD Agency, he agreed to convey to PGA an installment note with a face value of $50,000, of which Hoffman was the obligor, "as an offset against the amount due to Progressive General Agency, Inc. from RCD Agency, Inc., relative to the four percent (4%) Service Representative Contract entered into on the second day of January, 1963," which contract was dated February 13, 1964, and was signed by McLarty, his wife and an officer of PGA. Bloss testified the contract had penciled initials on each signature line, and identified the penciled markings as those made by Hoffman.

Evidence of additional stock transactions was introduced showing the purchase of convertible debentures of Insurors Holding Corporation and stock of PGI by Multi-State in August, 1962. Multi-State paid $363,000 for these purchases; converting the debentures into 237.5 shares of Insurors Holding stock on February 4, 1964, in Atlanta, Georgia. Garland Byrd, attorney for McLarty, testified that Hoffman presented pre-prepared minutes of RCD Management providing for exchange of the 68,-250 shares of PGI stock for 88.725 shares of Insurors Holding preferred stock. These pre-prepared minutes were then signed by McLarty, his wife and Byrd. Each signature line had been penciled with initials of the person to sign as in previously identified corporate minutes.

Multi-State sold its $363,000 investment in Insurors Holding Corporation on July 8, 1964, to So-Jess, for which it paid Multi-State the sum of $163,112.50 at $500 per share. The minutes of RCD Management authorized the sale by Multi-State dated May 28, 1964, and were signed by directors including Alfred

Druker, who was also a director of the purchaser, So-Jess. During this same period, when So-Jess was purchasing identical stock at $500 per share, PGA had paid prices ranging from $1,000 to $1,200 per share from individual owners.

Hoffman's appeal alleges the following prejudicial errors:

1. The court improperly admitted evidence of transactions prior to February 4, 1964.

2. The court did not take appropriate precautions to determine whether jurors had read news articles concerning the trial.

3. The court refused to give certain instructions requested by defendant.

4. The court permitted improper cross-examination of Vaughn Woodruff, defendant's attorney.

5. The prosecutor used inflammatory language in his closing argument.

6. The court erred in the sentencing.

Hoffman has not alleged any issue contesting the sufficiency of the evidence.

### 1.  Prior Transactions

Hoffman alleges the trial court erred in permitting the Government to introduce evidence of transactions prior to and after the sale of the controlling stock to McLarty, contending that the evidence of the non-indictment events were inadmissible and of "no probative value" of his intent or motive to commit the offenses charged. Defendant cites Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892), United States v. Magee, 261 F.2d 609 (7th Cir. 1958), and United States v. Dressler, 112 F.2d 972 (7th Cir. 1940), as sustaining his view that evidence that he was engaged in wrongdoing unconnected with the charge in the indictment is error. We agree with the general statement. However, in each of the cases cited, the factual and evidentiary posture varies greatly from the case before us. In *Boyd,* the defendant was convicted of murder arising out of an attempt to rob.

Over objection, the trial court allowed testimony before the jury concerning several other previously committed robberies in which the defendant participated. There was no causal connection or relationship between the robberies, and the court quite properly found error in their introduction at the trial. In *Magee,* a witness was allowed to testify, identifying the defendant as one who participated in a prior unconnected bank robbery in another state approximately two years previous to the robbery on trial. *Dressler* was a kidnapping trial, during which trial fingerprint cards were passed among the jurors. On the reverse side of the cards was the "criminal history" of the defendant which the court held was "prejudicial information" and therefore reversed the guilty finding.

Each of these cases is clearly distinguishable from the case before us. The general rule is that evidence that the accused .has committed another crime independent of, and unconnected with the one on trial, is inadmissible. The cases cited by Hoffman clearly fall within this general rule. However, there are exceptions to this general rule, Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941) held, at 227, 62 S.Ct. at 286, "that similar but disconnected acts may be shown to establish intent, design, and system." Bracey v. United States, 79 U.S.App.D. C. 23, 142 F.2d 85, 87 (1944), sets forth the exception with greater detail:

> However, there are many well established exceptions to this rule, raised by the special circumstances of particular cases; to the end that all relevant facts and circumstances tending to establish any of the constituent elements of the crime of which the defendant is accused may be made to appear. Thus evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends locally to prove any

element of the crime charged. Such evidence is admissible if it is so related to or connected with the crime charged as to establish a common scheme or purpose so associated that proof of one tends to prove the other, or if both are connected with a single purpose in pursuance of a single object; as well as to establish identity, guilty knowledge, intent and motive.

This rule has been recognized in this circuit for many years and more recently was stated in United States v. Wall, 225 F.2d 905 (7th Cir. 1955); United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955), cert. denied, 350 U.S. 966, 76 S. Ct. 435, 100 L.Ed. 839 (1956); United States v. Magee, 261 F.2d 609 (7th Cir. 1958) (one of the cases relied upon by defendant); United States v. Phillips, 375 F.2d 75 (7th Cir. 1967); and United States v. Cobb, 397 F.2d 416 (7th Cir. 1968).

The intent and motive of Hoffman was expressed by him around Thanksgiving of 1961. Fred Levin, an attorney for the Illinois Department of Insurance, testified that during a meeting concerning the financial impairment of Multi-State, Hoffman "told me that if the State continued to push him on these things, he would write an excessive amount of premium and leave the State with an empty shell of a company."

In November, 1963, the Illinois Director of Insurance attempted to enjoin Multi-State from transacting any further business. Simultaneously, Hoffman set in motion the series of transactions that finally depleted the assets of Multi-State, as well as the intricate direction of multitudinous inter-organizational assumptions of financial obligations and asset transfers all of which were "so blended or connected with the one on trial as that proof of one incidentally involves the other." Bracey v. United States, *supra*. Hoffman continued to execute his threat to leave an "empty shell" through his actions and directions after the "sale" in February, 1964, by obtaining the signatures of the "purchas-

ers" on documents authorizing transfers after the sale date.

We hold that the trial court properly allowed the introduction of other transactions to prove motive and design to establish a common scheme relating to the matter on trial.

## 2. Publicity

Hoffman further alleges as error that the court did not take appropriate precautions to determine whether jurors had read newspaper stories about him which were published during the trial and thereby were prejudiced. Hoffman did move that each juror be asked out of the presence of the others whether he had read the story carried in a Chicago daily newspaper of May 5, 1967. The motion was denied by the court which followed this ruling with a restatement of his daily admonition of caution about hearing or seeing anything in any media printed or otherwise, and asked the jury collectively whether anyone had heard or read anything relating to the case on trial. No response was made by any juror. On May 9, a similar motion was made following another news story; the motion was denied; the same question was asked and no juror responded.

The court carefully instructed the jury not to read any articles relating to the trial on numerous occasions during the trial, as well as the two specific dates when news articles were printed. The claim of prejudice is based upon a speculation that the jurors violated the court's admonitions and it was error for the court to deny individual examination of the jurors about the news stories.

This Court recently held in Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969), that "the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the

presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further."

■ Thus, the district court in the instant case committed no error in its collective inquiry of the jury.

### 3. Instructions

■■ The defendant further assigns as error the failure of the court to give certain instructions requested by him. We have reviewed the instructions given by the court and find that Judge Austin met all the criteria of informing the jury of the essential elements of the indicted offenses for which Hoffman was being tried. Certain of the instructions refused were intended for the purpose of informing the jury that some of the Government's evidence introduced had no direct application to the crimes for which Hoffman was being tried. The court adequately covered these transactions in the given instructions, informing the jury that this evidence was introduced for the

> [L]imited purpose of determining whether or not the defendant had a motive to commit the crime charged, and were not introduced into evidence to prove a particular transaction with which he is charged. You are to consider that evidence only for the purpose of determining whether or not defendant had a motive for committing those acts charged in the indictment."

The court adequately informed the jury of the difference and protected defendant's presumption of innocence. Additionally, the instructions given precisely set forth the necessary elements of the crime alleged to have been committed.

Defendant further contends that refused instruction 17 prejudiced his position in that the given instruction inadequately informed the jury of the Government's responsibility to prove the

crime charged in Counts 1 and 2. Count 1 alleged that defendants did falsely pretend there was a sum of money due and owing RCD Management from Multi-State. Count 2 further alleged that, as part of the scheme, defendant Hoffman caused $585,845.21 to be transmitted by mail and telegram to the Citizens State Bank at Reynolds, Georgia, for credit to the account of Multi-State, that defendant Hoffman sold and defendant McLarty purchased all the stock of RCD Management and RCD Agency, that defendant McLarty transferred $335,000 of Multi-State's account to RCD Agency's account, that McLarty thereafter transferred $334,000 from RCD Agency's account to himself, and finally that McLarty transferred $333,000 from his own account to defendant Hoffman. The court's instructions informed the jury of the elements necessary and the Government's burden of proof that the alleged false pretense that Multi-State owed a debt to RCD Management and RCD Agency must be proved beyond a reasonable doubt. We find the court committed no error in its instructions.

### 4. Cross-Examination

■ The defendant contends the court committed error in permitting certain cross-examination of Vaughn Woodruff, Hoffman's attorney during 1963 and 1964. The error alleged is that the cross-examination extended beyond the scope of the direct examination. Defendant called Woodruff as his witness and, during his qualifying of him as an expert witness, reviewed his education and various positions of employment since his admission to the bar. The court during this qualifying questioning suggested that Woodruff's admission to the bar of Illinois was adequate. Counsel persisted in qualifying and proceeded to do so after which Woodruff testified that he represented many insurance companies. The Government, on cross-examination, asked Woodruff whether or not 13 of the insurance companies he represented had become insolvent. Defendant claims this form of questioning

nullified him as a witness and prejudiced Hoffman in the eyes of the jury. Defendant by persisting in his expert qualification of Woodruff, opened the door to cross-examination in a manner common in trial practice and cannot now complain for having provided the vehicle. It is a well settled rule of law that cross-examination is limited to matters embraced within the direct examination. An exception is that cross-examination is permitted for testing witnesses' memory. Lewis v. United States, 373 F.2d 576, 578 (9th Cir. 1967). The court properly overruled defendant's objections, and might have committed error had he ruled otherwise. United States v. Mills, 366 F.2d 512 (6th Cir. 1966).

### 5. Closing Argument

Defendant contends further that remarks of government counsel in his closing argument were improper and inflamed the jury and that the court erred in not granting his motion for a mistrial.

■ In an examination of the Government's closing argument, we believe counsel did appeal to sympathy and passion. His reference to defendant as a liar, crook, wheeler and dealer, and similar terms were not conducive to the fair trial to which defendant was entitled. The reference to "contempt for law and order," at a time when there is a general public concern for personal safety, is an unfortunate reference. It is understandable that lawyers in their advocacy may on occasion become emotionally involved in a matter on trial; thus in the interest of the law we each have sworn to uphold, we must constrain our emotional characteristics to provide fairness and justice. Nevertheless, a review of the entire record convinces us that the excesses of argument are harmless error in the light of the weight of the evidence. Chapman v. California, 386 U.S. 18, 22–26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1964); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (June 2, 1969); and United States

v. Fidanzi, 411 F.2d 1361 (7th Cir., June 23, 1969).

The record is replete with evidence of the manipulations of Hoffman, more than sufficient to sustain the finding of guilty by the jury. Counsel's argument, while improper in its intensity, was an accurate characterization of defendant's actions. United States v. Fidanzi, *id.* at 1362.

### 6. Sentencing

The final allegation of error relates to the sentencing of Hoffman. The court entered judgment on the verdict, committing defendant to the custody of the Attorney General or his authorized representative for a period of ten (10) years and a fine of Ten Thousand ($10,000) Dollars and costs on Count 4, and placed him on probation for a period of five (5) years on Counts 1 and 2, subject to making "restitution in an amount agreed upon or ascertained by the Director of Insurance of the State of Illinois."

Defendant contends that the incarceration sentence followed by a period of probation is in violation of his civil rights. There is no substance to this claim of error since the violations for which defendant was found guilty are two separate offenses under 18 U.S.C. § 2314 and §§ 1343 and 1341. Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L.Ed. 306 (1932).

■ We find that the conditioning of probation upon restitution of a sum of money to be determined is violative of 18 U.S.C. § 3651, which provides that a defendant "[m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense which conviction was had."

The cases in reference to the interpretation of this section are few in number. United States v. Follette, 32 F.Supp. 953 (E.D. Pa. 1940), involved embezzlement and conversion of $203.99 of U.S. postal funds. Judge Maris, at the expiration of the probationary period, had present-

ed to him the question of restitution of the sum of $466.28, a sum greater than that for which defendant had been convicted, arising from other embezzled funds. The court held that it had no authority to order, as a condition to probation, the repayment of a sum greater than the actual losses caused by the offense. Karrell v. United States, 181 F. 2d 981 (9th Cir. 1950), is a Service Readjustment Act of 1944 case concerned with an overpayment for the purchase of real estate in a sum greater than the appraised value. In sentencing the defendant, probation was conditioned upon restitution to 18 designated veterans of listed overpayments aggregating $7,300. The indictment contained seventeen counts; defendant was acquitted on two counts, guilty on six counts, and nine counts were dismissed. The order of restitution included all seventeen named veterans and an additional veteran not named in the indictment. The court followed the interpretation in *Follette* and remanded the cause to the trial court ordering limitation of the sum as restitution to the difference between the appraised value and the actual purchase price suffered by the six veterans named in the six counts upon which defendant was convicted. For such a condition of probation, the parties aggrieved must be certain and the amount of restitution definite of computation.

United States v. Stoehr, 196 F.2d 276, 33 A.L.R.2d 836 (3d Cir. 1952), is a case in which defendant was convicted of evading federal income taxes for the years 1943, 1944 and 1945. Defendant was fined $10,000 and sentenced to imprisonment for a period of three years on each of the first two counts, to run consecutively, and probation on Count 3 conditioned upon payment of all income taxes due the United States with interest and penalties. The court held that since the exact amount is not determined by the criminal action, the condition of probation must be modified to read "finally determined to be due for the years involved," or the condition of probation is inoperative.

United States v. Taylor, 305 F.2d 183 (4th Cir. 1962), the most recent of the cases interpreting 18 U.S.C. § 3651, also involved a federal income tax matter. Defendant pled guilty to two of the counts and was found guilty by a jury on the third count. He was sentenced to a prison term of one year and fined $5,000 on each of the first two counts, the prison terms to run consecutively, and on the third count, a prison term of two years to run consecutively with the first two counts, plus a fine of $10,000. The prison sentences were suspended and defendant placed on probation for a period of five years, conditioned upon payment of a total fine of $20,000 by March 1, 1962, and to pay to the District Director of the Internal Revenue Service the sum of $32,210.40, with interest thereon. Defendant appealed, challenging the court's right to impose certain of the special conditions of probation. The court found that (*id.* at 186):

> [the] District Judge's order is quite confusing and certainly does not set forth an account of defendant's total tax liability with precision and clarity. We are thus unable to ascertain from the record before us the amount of tax actually owed by defendant * * *.

The court further found that the amounts to which the district judge was limited were the basic amount stated in the indictment for the year 1955, and the amounts admitted for the years 1958, 1959, and 1960. Any amounts in excess of this sum "may not, as a condition of probation, be directed to be paid during the probationary period prior to the time such amounts are finally and legally determined, and then only if collection is not barred by a statute of limitation" *Id.* at 187.

It is our finding on the record before us that the "aggrieved parties" portion of § 3651 is not identified here and the "actual damages or loss caused" is not fixed nor is the sum definite or yet determined with exactitude. Failure of the condition of probation to meet the

requirements of identity and amount requires that the cause be remanded for revision of the condition of probation to meet the requirements of 18 U.S.C. § 3651, or the vacation of such condition.

Affirmed in part, reversed in part, and remanded.